IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JUST PUPPIES, INC., *et al.*,
*Plaintiffs*,

v.                                                Civil Action No. ELH-19-2439

BRIAN E. FROSH, *et al.*,
*Defendants*.

## MEMORANDUM OPINION

This case concerns a challenge to the State of Maryland's "No More Puppy-Mill Pups Act" (the "Act" or "Puppy-Mill Act"), Md. Code (2015 Repl. Vol, 2019 Supp.), § 19-701 *et seq.*, of the Business Regulation Article ("Bus. Reg."). Under the Act, which went into effect on January 1, 2020, retail pet stores located in Maryland "may not offer for sale or otherwise transfer or dispose of cats or dogs." *Id.* § 19-703.

Four pet stores, a dog breeder, and a dog broker have filed suit, seeking, *inter alia*, an injunction prohibiting enforcement of the Act as well as a declaration that the Act is unconstitutional under the Commerce Clause and the Equal Protection Clause of the Constitution. ECF 1 ("Complaint"). The plaintiffs are Just Puppies, Inc. d/b/a Just Puppies Towson; Just Puppies of Maryland, Inc. d/b/a Just Puppies Rockville (collectively, "Just Puppies"); Charm City Puppies, LLC d/b/a Charm City Puppies & Boutique ("Charm City Puppies"); Today's Pet, Inc. d/b/a Today's Pet; Jodie Hancock, a dog breeder located in Missouri; and, Sobrad, LLC d/b/a Pinnacle Pet, a Missouri-based broker of dogs ("Pinnacle Pet"). They have sued Brian E. Frosh, in his capacity as the Attorney General of Maryland; the Consumer Protection Division of the Office of the Maryland Attorney General (the "CPD"); and the Maryland House Economic Matters Committee and the Maryland State Senate Finance Committee, as part of the Maryland General

Assembly (collectively, the "Committee Defendants"). At times, I shall refer to the defendants collectively as the "State."

Plaintiffs filed their Complaint on August 23, 2019, about fifteen months after the Act was signed into law and a few months prior to its effective date. It contains eight counts. Counts I, II, and III allege that the Puppy-Mill Act violates the implied limits on state power imposed by the Commerce Clause of the Constitution. *Id.* ¶¶ 92-123; *see* U.S. Const. art. I, § 8, cl. 3. Count IV asserts that the Act is preempted by the Animal Welfare Act of 1966, codified at 7 U.S.C. § 2131 *et seq.* ECF 1, ¶¶ 124-29. In Count V, plaintiffs allege that the Act violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution. *Id.* ¶¶ 130-36; *see* U.S. Const. amend. XIV. Count VI alleges that the Puppy-Mill Act gives unregulated breeders and animal shelters a monopoly to sell pets to Maryland residents, in violation of Article 41 of the Maryland Declaration of Rights. ECF 1, ¶¶ 137-46. In Count VII, plaintiffs seek a declaratory judgment, pursuant to 28 U.S.C. § 2201, that the Puppy-Mill Act violates federal law. ECF 1, ¶¶ 147-50. And, in Count VIII, plaintiffs request preliminary and permanent injunctive relief. *Id.* ¶¶ 151-54.

The State has moved to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(1), on sovereign immunity grounds, and under Fed. R. Civ. 12(b)(6), for failure to state a claim. ECF 5. The motion is supported by a memorandum of law (ECF 5-1) (collectively, the "Motion") and one exhibit. ECF 5-2. Plaintiffs oppose the Motion (ECF 18, "Opposition"), supported by five exhibits. ECF 18-2 to ECF 18-6. Defendants have replied. ECF 24.

On October 23, 2019, plaintiffs filed a motion for preliminary injunction, seeking to stay the enforcement of the Puppy-Mill Act pending the resolution of this case. ECF 20 ("Preliminary Injunction Motion" or "P.I. Motion"). Defendants oppose the P.I. Motion (ECF 25), and plaintiffs replied. ECF 26.

In addition, several amici curiae have filed memoranda. The Humane Society of the United States ("HSUS" or "Humane Society") filed a brief in support of defendants (ECF 10), to which plaintiffs responded. ECF 19. And, the Pet Industry Joint Advisory Counsel and Citizens for Responsible Pet Ownership filed a brief in support of plaintiffs. ECF 33.

On January 29 and January 30, 2020, the Court held an evidentiary hearing on the P.I. Motion. The Court also heard oral argument as to the P.I. Motion and the Motion.

For the reasons that follow, I shall grant the Motion (ECF 5). Accordingly, I shall deny the Preliminary Injunction Motion (ECF 20).

## I.    Background[1]

The retail model for cats and dogs typically involves three categories of players. ECF 1, ¶¶ 89-90. Breeders produce litters of puppies and kittens. *See id.* ¶ 89. Some breeders sell their inventory to retail stores or consumers, while others sell to brokers, who then re-sell the animals. *Id.* ¶¶ 89-90. At the end of the supply chain, brick-and-mortar stores sell cats and dogs to the public.

Breeders and brokers who sell cats and dogs in interstate commerce must comply with the Animal Welfare Act of 1966 ("AWA"), 7 U.S.C. § 2131 *et seq.*, and its implementing regulations, issued by the Secretary of the United States Department of Agriculture ("USDA"). The AWA does not govern retail pet stores. But, as discussed, *infra*, retail pet stores in Maryland are subject to Maryland regulation.

---

[1] As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the suit. *See* Fed. R. Civ. P. 12(b)(1); *see, e.g.*, *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019). Further, the Court "may take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).

## A. The Animal Welfare Act of 1966

Congress enacted the AWA, in part, to "insure that animals intended . . . for use as pets are provided humane care and treatment[.]" 7 U.S.C. § 2131; *see also* ECF 1, ¶ 16. To achieve this goal, the AWA regulates animal "dealers," which it broadly defines as "any person who, in commerce, for compensation or profit, delivers for transportation, or transports, except as a carrier, buys, or sells, or negotiates the purchase or sale of . . . any dog or other animal whether alive or dead for research, teaching, exhibition, or use as a pet[.]" 7 U.S.C. § 2132(f). Notably, the AWA's definition of dealer explicitly excludes retail pet stores. *Id.*

Under the AWA, a dealer must possess a valid license to buy, sell, or transport in commerce a cat or dog intended for use as a pet. *See id.* § 2134. But, the AWA does not establish a detailed regulatory scheme, instead authorizing the USDA Secretary to craft the details. *See id.* § 2133 (granting authority to prescribe licensing process); *id.* § 2143(a)(1) (providing that "[t]he Secretary shall promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers"); *id.* § 2146(a) (directing the Secretary to "make such investigations or inspections as he deems necessary to determine whether any dealer . . . has violated or is violating [the AWA]").

Pursuant to this authority, the USDA Secretary has created three licensing categories. 9 C.F.R. § 1.1. Two are implicated here. A "Class 'A' licensee" is any dealer subject to licensure under the AWA "whose business involving animals consists only of animals that are bred and raised on the premises." *Id.* A "Class 'B' licensee" is any regulated dealer "whose business includes the purchase and/or resale of any animal," including "brokers . . . [who] negotiate or arrange for the purchase, sale, or transport of animals in commerce." *Id.*[2] Breeders who have four

---

[2] The third classification concerns exhibitors. *See* 9 C.F.R. § 1.1.

or fewer breeding females and sell only their offspring are exempt from the AWA's licensing requirements. *Id.* § 2.1(a)(3)(iii).

Licensees must abide by certain standards of care. *Id.* § 2.3(a). These requirements include housing dogs and cats in structurally appropriate enclosures, *id.* §§ 3.1-3.6; feeding them at least once a day, *id.* § 3.9; and ensuring that their environment is sanitary and free of pests. *Id.* § 3.11.[3] Licensees must also maintain detailed records of each animal they buy or sell, *id.* § 2.75, and they must provide the USDA Secretary with sales information on an annual basis. *Id.* § 2.7. In addition, licensees are subject to random inspections by USDA officials. *Id.* § 2.126. Licensees who violate the AWA or USDA regulations face civil penalties and the suspension or revocation of their license. 7 U.S.C. §§ 2147, 2149. USDA regulations provide that "[a]ny person whose license has been suspended or revoked shall not buy, sell, transport, exhibit, or deliver for transportation, any animal during the period of suspension or revocation." 9 C.F.R. § 2.10(c).

Significantly, the AWA expressly contemplates state and local regulation of commerce in animals. The statute authorizes the USDA Secretary "to cooperate with the officials of the various States or political subdivisions thereof in carrying out the purposes of this chapter and of any State, local, or municipal legislation or ordinance on the same subject." 7 U.S.C. § 2145(b). Further, the AWA provides that its grant of authority to the USDA Secretary to issue regulations "govern[ing] the humane handling, care, treatment and transportation of animals by dealers," *id.* § 2143(a)(1), "shall not prohibit any State (or a political subdivision of such State) from promulgating standards in addition to those standards[.]" *Id.* § 2143(a)(8).

---

[3] The Humane Society describes the AWA's "care standards" as "essentially survival-level standards," and claims that they do not ensure that animals are treated humanely. ECF 10 at 5-6. For example, citing 9 C.F.R. § 3.6, it notes that dogs may be kept in "stacked, wire bottom cages" that are "only 6 inches larger than the dog[.]" ECF 10 at 6 & n.16.

**B.  Maryland Regulation of Pet Sales Before the Puppy-Mill Act**

Many states, including Maryland, have sought to regulate the sale of pets in an effort to address the harms associated with "puppy mills."  ECF 1, ¶ 18; *see also* Rebecca F. Wisch, *Table of State Commercial Pet Breeder Laws*, MICH. ST. U. C. OF L.: ANIMAL LEGAL & HISTORICAL CTR. (2017), *archived at* https://perma.cc/G8XK-M7QM (cataloging states' breeder regulations).[4]  The pejorative term "puppy mill" is used by the animal rights community to describe high-volume breeding operations where dogs are kept in overcrowded and unsanitary conditions and are treated inhumanely.  *See* Katherine C. Tushaus, Note, *Don't Buy the Doggy in the Window: Ending the Cycle that Perpetuates Commercial Breeding with Regulation of the Retail Pet Industry*, DRAKE J. OF AGRIC. L. 501, 502-03 (2009).

In 2012, Maryland sought to tackle this issue by imposing regulations on retail pet stores. ECF 1, ¶¶ 19-25; *see* 2012 Md. Laws., Ch. 214.  Title 19 of the Business Regulation Article is called "Miscellaneous State Business Regulation."  Subtitle 7 is titled "Retail Pet Stores."  A retail pet store was defined as "a for-profit establishment open to the public that sells or offers for sale domestic animals to be kept as household pets."  Bus. Reg. § 19-701(j) (repealed eff. Jan. 1, 2020). Pursuant to Maryland law, such stores had to maintain written records of the breeders and brokers

---

[4] According to the non-profit organization Best Friends Animal Society, as of December 2019, 322 jurisdictions in the United States have banned retail pet stores from selling cats and dogs from some or all sources.  *See States with Retail Pet Sale Bans*, BEST FRIENDS, *archived at* https://perma.cc/XT2H-PE4W.  In addition to Maryland, California and Maine recently enacted laws prohibiting the sale of cats and dogs in stores, although each contains exceptions.  *See* Cal. Health & Safety Code § 122354.5 (2020) (restricting pet stores to selling only cats or dogs sourced from animal rescues and control units); Me. Stat. tit. 7, § 4153 (2020) (banning the sale of cats and dogs in retail pet stores, but excepting existing stores from regulation).

New York is contemplating a pet store ban similar to Maryland's.  *See* Sarah Maslin Nir, *Pet Shop Horrors Fuel Bill for a Statewide Ban on Retail Sales of Cats and Dogs*, N.Y. TIMES, Feb. 1, 2020, at A23.

they utilized, including the state in which the dealer was located and his or her USDA license number. *See id.* § 19-703 (repealed eff. Jan. 1, 2020). Stores also had to "conspicuously" post each puppy's breed, age, date of birth, and medical history, and provide purchasers with a health certificate from a licensed veterinarian certifying that the dog is healthy. *Id.*

Maryland's regulations were not without force. State law provided that, within seven days of purchase, a dog could be returned if a veterinarian determined that it suffered from an illness, and within 180 days if diagnosed with a congenital or hereditary condition. Bus. Reg. § 19-705, (repealed eff. Jan. 1, 2020). Stores that violated the reporting requirements were subject to penalties under Maryland's Consumer Protection Act, Md. Code (2015 Repl. Vol.), § 13-301 *et seq.* of the Commercial Law Article ("C.L."). *See* Bus. Reg. § 19-706 (repealed eff. Jan 1, 2020).

In 2016, the Maryland General Assembly took further action to protect the public as well as cats and dogs. ECF 1, ¶¶ 26-32; *see* 2016 Md. Laws., Ch. 572. A retail pet store could offer a dog or cat for sale only if the dog or cat was obtained from (1) an animal welfare organization; (2) an animal control unit; (3) the original breeder of the dog or cat if the breeder was USDA licensed; or (4) a dealer that obtained the dog or cat from a USDA licensed breeder. Bus. Reg. § 19-702.1(a) (repealed eff. Jan 1, 2020). According to plaintiffs, this requirement "effectively banned local breeders and/or hobby breeders from selling pets to Maryland pet stores because these types of breeders are unregulated and do not hold a USDA license." ECF 1, ¶ 28 (citing 7 U.S.C. § 2123). Maryland further limited the breeders and brokers from which pet stores could source cats and dogs by prohibiting stores from doing business with dealers who had received citations from the USDA for certain violations. Bus. Reg. § 19-702.1(b) (repealed eff. Jan 1, 2020).

## C. The Puppy-Mill Act

Between 2012, when Maryland first began regulating pet stores, and 2018, the CPD received twenty-five consumer complaints concerning Maryland's sourcing laws. ECF 1, ¶ 35. Of these complaints, the CPD found violations in just four cases; none resulted in fines. *Id.* According to plaintiffs, actual pet purchasers accounted for five of the complaints while the rest were lodged by individuals associated with animal rights organizations. *Id.* To animal welfare organizations, however, the paucity of citations was evidence that Maryland's laws were ineffective. *See id.* ¶¶ 33-34. These groups lobbied the Maryland General Assembly for stricter measures, asserting, "without any factual evidence, that Maryland retail pet stores were fueling the growth and establishment of unlicensed and uninspected 'puppy mills.'" *Id.* ¶ 33.

On February 9, 2018, Benjamin Kramer, a member of the Maryland House of Delegates, introduced House Bill 1662, the "No More Puppy-Mill Pups Act of 2018." *See Legislation: HB1662*, Maryland General Assembly, *archived at* https://perma.cc/8RYA-D37X (Hereafter, "H.B. 1662 Legislative Record"). The House Economic Matters Committee held a hearing on the Act on March 12, 2018.

At the hearing, Delegate Kramer testified in support of the Puppy-Mill Act. ECF 18-3 (3/12/18 Hearing) at 3-5. He played several videos depicting the deplorable conditions of puppy mills. And, he testified that, in his view, the USDA's regulations were inadequate to ensure the humane treatment of dogs. *Id.* at 4-5. He stated, *id.*:

> USDA regulations are nothing more than survival requirements. There is no limit to the number of dogs on the premises. A puppy mill could have hundreds and often thousands of dogs. There is no requirement on the number of staff that must be available to care for the dogs. Dogs are kept in stacked cages with wire mesh for flooring. Dogs are forced to relieve themselves in their cages. Dogs are confined in spaces only six inches─six inches larger than their bodies. Dogs are caged twenty-four hours a day for their entire lives only to be removed from the cage when being bred. There is no exercise requirement at all. If they are caged with other dogs, as you saw on the video, that's considered exercise when seven or eight of these dogs

are crammed into a cage together. No human action at all is required by the USDA. And breeding females can be bred at their first heat and every heat cycle following that. The USDA leaves it up to the puppy mill owners to determine what is adequate food and water. The USDA currently has an estimated 110 inspectors to inspect all facilities under its supervision which is 8,000—almost 9,000 facilities which also includes the circuses, the zoos, the petting farms, wild life parks, research facilities and animal transporters. When audited a few years ago it was discovered that very few of the inspectors were taking any action against the puppy mills. And in fact, some of the most egregious conditions had been—for puppies had been visited just before the audit and no citations at all had been written up for the puppy mills.

Further, Delegate Kramer testified that the laws concerning pet stores were insufficient to ensure that the animals sold in Maryland pet stores were sourced from reputable breeders. He explained, ECF 18-3 at 5: "As recently as this past December, Animal Welfare Advocates went out and visited every one of the retail pet stores still selling puppies and kittens. Not one store— not one store was in compliance with Maryland State Law on this issue." Thus, Delegate Kramer stressed that the Act was necessary to stop pet stores from "facilitating the abomination that is the puppy mills[.]" *Id.*

The House Economic Matters Committee also heard from advocacy organizations who supported the Act. Emily Hovermale, the Maryland State Director of HSUS, testified that pet store puppies are often sick as a result of the squalid conditions in which they were raised. *Id.* at 9. As an example, she testified that the Centers for Disease Control recently linked a puppy purchased at a pet store to an outbreak of a drug-resistant bacteria that infected 113 people, including five Maryland residents. *Id.* In addition, Ms. Hovermale argued that "[t]he puppy store model is outdated and socially unacceptable," pointing out that of the largest twenty-five pet store chains in North America only one sells cats and dogs. *Id.* And, she explained that the Puppy-Mill Act "will not impact responsible breeders because they do not already sell to pet stores and rather sell directly to the public so that they can meet prospective buyers in person." *Id.*

Amy Jesse, the Policy Director for HSUS's Stop Puppy Mills Campaign, reaffirmed the points made by Delegate Kramer and Ms. Hovermale. Ms. Jesse testified that "Maryland's current law which requires pet stores to only source from USDA licensed breeders without certain violations of the animal welfare act is not working" because "it is based on a very broken USDA licensing and inspection program." ECF 18-3 at 9. She pointed out that the USDA had removed its inspection reports from the public domain, preventing consumers from verifying if a breeder held a valid license or had received any citations. *Id.* at 10. She also testified that HSUS had recently visited Just Puppies and found that the stores were "buying from breeders with abysmal records," some of whom were "notorious" for running puppy mills. *Id.*

Sharon Larkin, a Maryland resident, testified in favor of the Puppy-Mill Act. *Id.* She told the committee members that pet stores are the "heart of the problem" because "they provide a coverup for the mill industry." *Id.* She explained that Maryland's sourcing laws, which "strive for transparency," had been thwarted by the USDA's decision to remove inspection reports from public view. *Id.* And, Ms. Larkin testified that during a recent visit to a Maryland pet store the store's owner had refused to furnish inspection reports. *Id.*

The committee members also heard from Katie Flory, the Community Affairs Director with the Maryland Chapter of the American Society for the Prevention of Cruelty to Animals, better known as the ASPCA. *Id.* at 12. According to Ms. Flory, animal shelters in Baltimore City serve 17,000 animals. *Id.* Accounting for the surrounding counties, those shelters hold an estimated 34,000 cats and dogs. *Id.* Ms. Flory urged that the Puppy-Mill Act would promote adoptions while also preventing puppy-mill puppies from ending up in shelters. *Id.*

Opponents of the Act also testified at the hearing. Becky Schmidt, the manager of Charm City Puppies, explained that the store strives to serve the specific needs of its customers, such as

those looking for an emotional support dog or service animal. *Id.* at 14. In addition, Jeanea Thomson, co-owner of Just Puppies, testified in opposition to the Act. *Id.* at 15. Ms. Thompson denied that her cats and dogs came from puppy mills. *Id.* Rather, she testified that she and her staff visit the breeders regularly and form strong relationships with them to ensure that the dogs are treated humanely. *Id.* And, she warned the committee members that the Puppy-Mill Act would "drive prospective pet owners to unregulated sources like the internet." *Id.*

The owner of Today's Pet, Joseph Wagner, described a study by Cornell University School of Medicine, which found that pet store puppies were, on average, as healthy if not healthier than puppies from other sources. *Id.* at 16. And, he explained that his store required breeders to send a copy of their USDA certification with each dog. *Id.* Further, he disputed the contention that pet store puppies end up in animal shelters, pointing to a study that found that ninety-six percent of puppies sold at pet stores remain with their family. *Id.*

Bob Likins testified on behalf of the Pet Industry Joint Advisory Council. *Id.* at 17. He maintained that there was "absolutely zero evidence" that Maryland's regulations were ineffective. *Id.* He also claimed that the dog breeds commonly found in shelters, like pit bulls, are not the same breeds sold by pet stores. *Id.*

The House debated the Act on March 15 and 16, 2018. During the debates, Delegate Kramer argued that the Act would not force pet stores to go out of business, highlighting that only seven of the 150 pet stores in Maryland sell cats or dogs. Pl.'s Ex. 4, HB1662_000448. When asked about the law's effect on Maryland consumers, Delegate Kramer explained that, in addition to fostering adoption, the Act would "encourage . . . people to come to local breeders," who "will never sell to a retail store, because they want . . . to make sure that the puppies from t[heir] litters are going to good homes[.]" *Id.* at HB1662_000450. Further, Delegate Kramer advocated against

inserting a grandfather clause into the Act for the seven Maryland pet stores that sell cats and dogs, stating, *id.* at HB1662_000456:

> The issue is not that these puppies are being purchased from illegal sources, the puppy mills are in fact legal in many states. The problem is that they are absolute horror shows and sadly, there are states that permit this. So the retail stores pet stores are not doing something illegal when they buy from the puppy mills. It's legal, but its disgusting and so what we are seeking to do here is stop this disgusting trade that allows the puppy mills to thrive. Without retail pet stores, selling the products of the abomination that are the puppy mills, then they will have no place to sell their pups.
>
> So we are looking to say, you know what, in the State or Maryland, if you want to adopt or if you want to get a breed-specific dog, then do so from a local breeder that actually cares about their breeding dogs and will meet you, get to know who you are, you get to know who they are, you meet the parents of the dog on site and that's what this bill is about.

H.B. 1662 was referred to the Senate Finance Committee on March 19, 2018, which held a public hearing on March 29, 2018. *See* H.B. 1662 Legislative Record. Among others, Delegate Kramer, Ms. Hovermale, Ms. Flory, and Ms. Jesse testified in support of the Act. *See* ECF 18-4 (3/29/18 Hearing) at 3-7, 13. And, Ms. Schmidt and Ms. Thomson testified in opposition. *See id.* at 8-11. Additionally, the committee members received testimony from veterinarian Mel Davis and Ann Miller, a USDA licensed dog breeder, both of whom opposed the Act. *Id.* at 11-12.

The Act was read before the Maryland Senate on April 5, 2018, during which State Senator Thomas Middleton, the Chair of the Senate Finance Committee, explained that the Act had been amended to allow the showcasing of cats and dogs in pet stores. Pl.'s Ex. 4, HB1662_000460. Specifically, he explained that, in an effort to "accommodate" breeders "that don't want to . . . have people come to their homes," the Act permits "breeders that breed dogs, local breeders that breed dogs," to bring their animals to pet stores and sell them directly to consumers. *Id.*

The Maryland Senate unanimously approved the Puppy-Mill Act on April 6, 2012. *See* H.B. 1662 Legislative Record. The Act later passed the Maryland House by a margin of 129 to 8.

*Id.*  On April 25, 2018, Governor Larry Hogan signed H.B. 1662 into law.  2018 Md. Laws., Ch. 237; *see also* ECF 1, ¶ 37.

The Act amended § 19-701, titled "Definitions."  And, it repealed § 19-702.1, titled "Requirements for retail pet stores."  The Act also substantially amended §§ 19-703, 19-704, 19-705, 19-706, and 19-707.

"Section 1" of the Puppy-Mill Act provides, in relevant part:

(a) *Prohibition*—A retail pet store may not offer for sale or otherwise transfer or dispose of cats or dogs.

(b) *Exception*—This section may not be construed to prohibit a retail pet store from collaborating with an animal welfare organization or animal control unit to offer space for these entities to showcase cats or dogs for adoption.

2018 Md. Laws., Ch. 237, § 1; Md. Code (2015 Repl. Vol., 2019 Supp.), Bus. Reg. § 19-703; *see also* ECF 1, ¶ 40.

The Puppy-Mill Act also contains two uncodified provisions.  *See* 2018 Md. Laws., Ch. 237, §§ 2-3.  They provide, *id.*:

SECTION 2. AND BE IT FURTHER ENACTED, That it is the intent of the General Assembly that:

(1) animal welfare organizations initiate contact with retail pet stores, as provided under § 19–703(b) of the Business Regulation Article, as enacted by Section 1 of this Act, that will no longer be able to offer for sale cats and dogs, to facilitate collaboration to showcase cats and dogs for:

(i) adoption from an animal control unit or an animal welfare organization; or

(ii) purchase from local breeders; and

(2) the Senate Finance Committee and the House Economic Matters Committee monitor the implementation of this Act.

SECTION 3. AND BE IT FURTHER ENACTED, That Section 1 of this Act shall take effect January 1, 2020.

The Act defines "animal control unit" by reference to Md. Code, § 10-617 of the Criminal Law Article as a "local organization or governmental unit that the appropriate local governmental body designates to house, care for, and control domestic animals of unknown ownership." Bus. Reg. § 19-701(b). An "animal welfare organization" is a tax-exempt nonprofit organization "whose mission and practice is the rescue of animals and the placement of those animals in permanent homes." *Id.* § 19-701(c).

The Act also defines "offer for sale" in § 19-701(f), as follows: "'Offer for sale' includes to sell, offer to transfer, offer for adoption, advertise for the sale, barter, auction, give away, or otherwise dispose of a domestic animal." But, the Act does not define the term "showcase." Nor does it define "local breeders."

A violation of the Puppy-Mill Act constitutes an unfair or deceptive trade practice within the meaning of Title 13 of the Commercial Law Article. Bus. Reg. § 19-704(a)(1). Stores in violation of the Act are subject to fines and civil penalties. *Id.* § 19-704(a)(2).

### D. The Plaintiffs

As noted, plaintiffs include a dog breeder, a dog broker, and several Maryland pet stores.

Ms. Hancock is a commercial dog breeder located in Missouri. ECF 1, ¶ 49. She breeds purebred dogs and designer breeds, such as Golden Doodles, and has supplied these dogs to Just Puppies for over fifteen years. *Id.* ¶¶ 49, 53. She is licensed by both the USDA and the State of Missouri. *Id.* As part of those licensing requirements, Ms. Hancock's facilities are subject to random and unannounced inspection, and she must reapply for her license each year. *Id.* ¶ 50.

Ms. Hancock alleges that she has never been found in violation of either USDA or Missouri regulations. *Id.* ¶ 52. In addition, representatives from Just Puppies visit Ms. Hancock's facilities

on a routine basis to ensure the quality and safety of her operation. *Id.* ¶ 54. Ms. Hancock does not maintain a website, nor does she sell directly to the public. *Id.* ¶ 55.

Pinnacle Pet is a Missouri-based dog broker licensed by the USDA, the State of Missouri, and "numerous other States." *Id.* ¶ 60. Pinnacle Pet purchases purebred and designer dogs and resells them to pet stores, including Charm City Puppies. *Id.* ¶¶ 60, 65. In its six years of business, Pinnacle Pet alleges that it has never been found in violation of federal or state regulations. *Id.* ¶ 63. Although Pinnacle Pets maintains a website, it sells only to pet stores. *Id.* ¶ 61. According to Pinnacle Pets, Maryland pet stores "constitute a large percentage of sales" in its Maryland-Pennsylvania sales region. *Id.* ¶ 66. Losing this business will have a "substantial impact" on Pinnacle Pets, causing it to "immediately terminate" employees who service the State. *Id.*

Plaintiffs Just Puppies, Charm City Puppies, and Today's Pets are pet stores with locations in Maryland. *Id.* ¶¶ 46-48, 56-59. They assert that they will go out of business if the Puppy-Mill Act goes into effect. *Id.* ¶ 72.

Just Puppies is a family-owned business that operates pet stores in Laurel and Towson. *Id.* ¶ 46. Just Puppies alleges that roughly 90 to 95 percent of its gross sales derive from dog sales. *Id.* ¶ 47. In contrast, it derives just 5 to 10 percent of its sales from pet accessories. Charm City sells purebred dogs and designer breed puppies. *Id.* ¶ 56. Like Just Puppies, Charm City derives nearly all of its revenue from selling dogs. *Id.* ¶ 57. Today's Pets, which is located in Columbia, Maryland, sells dogs, cats, birds, reptiles, fish, and other small animals. However, cats and dogs account for approximately half of its sales. *Id.* ¶ 59.

The pet stores maintain that they source pets only from reputable, USDA licensed breeders and brokers. *Id.* ¶¶ 48, 56, 59. And, they allege that they studiously complied with Maryland law

as it existed prior to the Puppy-Mill Act. *Id.* ¶¶ 67-69. Although Just Puppies, Charm City Puppies, and Today's Pet maintain websites, they do not sell dogs via the internet. *Id.* ¶ 71.

According to plaintiffs, in the absence of pet stores, Maryland residents "seeking to purchase purebred and designer puppies will have to rely on unregulated shelters and rescues, the unregulated internet and print advertising to try to locate such dogs." *Id.* ¶ 74. Plaintiffs assert that online sales of pets "have a notoriously high incidence of fraud and scams which will only increase against Maryland residents once the ban takes effect." *Id.*; *see also id.* ¶¶ 75-77. Further, plaintiffs allege that the Puppy-Mill Act interrupts the "stream of interstate commerce for the sale of pets in Maryland and through retail pet stores" by "disrupt[ing] the free market of commercial bred pets and instead favor[ing] non-profit and governmental sourced animals and unregulated local hobby breeders[.]" *Id.* ¶ 91.

### E. Hearing on The Motion and P.I. Motion[5]

As noted, the Court held an evidentiary hearing and heard oral argument on January 29 and 30, 2020. ECF 40; ECF 42. In support of the P.I. Motion, plaintiffs' counsel proffered that veterinarian Ernest Slovon would testify that puppies obtained by Maryland pet stores are of very good quality, with limited health problems.

Ms. Hancock testified that her breeding facility exceeds the AWA's standards, which she described as a "good minimum." She stated that, in her twenty years of breeding dogs, she has

---

[5] As discussed, *infra*, the testimony may not be considered in resolving the Motion. In view of the disposition of the Motion, I have included only a skeletal summary of the testimony.

The Court does not have access to a transcript of the evidentiary proceedings. In recounting the testimony, I have relied on my notes. I do not represent that any quotation is verbatim.

never received a citation from either the USDA or Missouri. And, Ms. Hancock explained that she does not sell to the public because she would not feel safe having strangers frequent her home.

Ms. Schmidt, the manager of Charm City Puppies, testified that the store strictly complied with Maryland's previous regulatory regime, and that the store obtained dogs only from responsible breeders. In addition, Ms. Schmidt testified that, as a result of the Act, Charm City Puppies had already laid off 10 of its 18 employees and will have to shutter in the near future if the Act is not enjoined.

Plaintiffs' counsel proffered that Jeanea Thomson of Just Puppies and Joseph Wagner of Today's Pets would testify to the same effect. The Rockville location of Just Puppies sold 1,181 dogs in 2017; 1,080 dogs in 2018; and 911 doges in 2019.[6] Each Just Puppies store has seven employees.

Christopher Fleming, the Chief Executive Officer of Pinnacle Pets, described how he conducts his dog broker business. Mr. Fleming testified that Maryland pet stores account for half of his business in the northeast and approximately ten percent of his total sales. According to Mr. Fleming, if he is no longer able sell puppies to Maryland pet stores, he would also stop servicing stores in Pennsylvania, Virginia, and New York, because he would shut down his delivery route. Mr. Fleming also testified that he purchases dogs only from quality breeders, but he acknowledged that "there are bad breeders out there that don't do a good job."

Michael Bober, a lobbyist with the Pet Industry Joint Advisory Council, also testified on behalf of plaintiffs. According to Mr. Bober, the Puppy-Mill Act is "misguided" and "is not what proponents say it is." Mr. Bober also distinguished the Act from those pet sale bans enacted by

---

[6] The State collects sales tax in connection with pet store sales.

other jurisdictions. According to Mr. Bober, Maryland is the only state that entirely bans the sale of cats or dogs.

At oral argument, plaintiffs argued that the Act violates the dormant Commerce Clause because it discriminates between Maryland breeders and brokers and those located out-of-state. Plaintiffs also asserted that the General Assembly was motivated by animus towards pet stores, and that the Act does not survive even rational basis review. In response, the State argued that the Act neutrally regulates interstate commerce because it permits all breeders and brokers to showcase cats and dogs. The State also posited that the General Assembly could have reasonably concluded that pet stores serve as a "conduit" for dogs sourced from substandard breeders, and that the Act addresses this problem by "creating a more direct connection between the consumer and the breeder."

## II. Principles of Law

### A. Rule 12(b)(1)

Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction. *See Demetres v. E. W. Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); s*ee also The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty.*, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999). A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge or a factual challenge. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted); *accord Hutton v. Nat'l Bd. of Examiners Inc.*, 892 F.3d 613, 620-21 (4th Cir. 2018); *Durden v. United States*, 736 F.3d 296, 300 (4th Cir. 2013).

In a facial challenge, "the defendant must show that a complaint fails to allege facts upon which subject-matter jurisdiction can be predicated." *Hutton*, 892 F.3d at 621 n.7 (citing *Beck v.*

*McDonald*, 848 F.3d 262, 270 (4th Cir. 2017)); *see also Kerns*, 585 F.3d at 192. Alternatively, in a factual challenge, "the defendant maintains that the jurisdictional allegations of the complaint are not true." *Hutton*, 892 F.3d at 621 n.7 (citing *Beck*, 848 F.3d at 270). In that circumstance, the court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *see also Beck*, 848 F.3d at 270; *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 333 (4th Cir. 2014); *Evans*, 166 F.3d at 647.

Defendants raise a facial challenge to the Court's subject matter jurisdiction, asserting that Eleventh Amendment sovereign immunity and the doctrine of legislative immunity foreclose plaintiffs' claims against the CPD and Committee Defendants. ECF 5-1 at 16-17. As indicated, this challenge is based on the four corners of the Complaint.

The Fourth Circuit recently reiterated that the defense of sovereign immunity is a jurisdictional bar, stating that "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'" *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (citation omitted), *cert. denied*, ___ U.S. ___, 139 S. Ct. 417 (2018). But, a defendant "bears the burden of demonstrating" sovereign immunity, because it is "akin to an affirmative defense." *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014).

**B. Rule 12(b)(6)**

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th

Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n

unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir.

2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]" *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, ___ U.S. ___, 135 S. Ct. 2218 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n*

*v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167. Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id.* Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Id.* at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) ) (emphasis in original) (citation omitted). *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'"

*Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

The Complaint is supported by one exhibit, which contains the text of the State laws applicable to retail pet stores in August 2019, when this suit was filed, as well as the text of the Puppy-Mill Act. ECF 1-1. In support of the Motion, defendants submitted a copy of written testimony provided to the House Economic Matters Committee by Ms. Hovermale. ECF 5-2. And, plaintiffs submitted five exhibits with their Opposition: a 338-page compilation of the Act's legislative history, including the Fiscal and Policy Note, the text of the legislation, proposed amendments, and the voting records of the Maryland General Assembly (ECF 18-2); a transcription of the hearing of the House Economic Matters Committee regarding the Act, held on March 12, 2018 (ECF 18-3); a transcription of the hearing held by the Senate Finance Committee on March 29, 2018, in regard to the Act (ECF 18-4); a copy of ECF 1-1 (ECF 18-5); and 429 pages of documents produced by the CPD on June 28, 2019, in response to plaintiffs' request under the Maryland Public Information Act ("MPIA"), Md. Code (2014 Vol., 2018 Sup.), § 10-611 *et seq.*, of the State Government Article. ECF 18-6.

The text of the Puppy-Mill Act and prior State laws regarding pet stores are integral to the Complaint. Thus, I may consider ECF 1-1 and ECF 18-5. The Act's legislative history and recordings of the hearings held on the Puppy-Mill Act are accessible on the website of the

Generally Assembly of Maryland. *See H.B. 1662 Legislative Record*; *House Economic Committee Meeting of March 12, 2018*, Maryland General Assembly, *archived at* https://perma.cc/SMM3-QC7D; *Senate Finance Committee Meeting of March 29, 2018*, Maryland General Assembly, *archived at* https://perma.cc/53NN-9EYQ. Therefore, I may take judicial notice of ECF 5-2, ECF 18-2, ECF 18-3, and ECF 18-4, not for the truth of the assertions contained therein but as evidence of the information presented to the Maryland General Assembly when it considered the Act.

In contrast, there is no indication that the contents of plaintiffs' MPIA request are publicly available. Plaintiffs provide no context for these documents, which are not referenced in the Opposition. Accordingly, in resolving the Motion, I shall not consider ECF 18-6.

Plaintiffs introduced 42 exhibits over the course of the two-day P.I. hearing. These exhibits include, *inter alia*, the Act's legislative history, financial records of the pet store plaintiffs, licenses and inspection reports for Ms. Hancock and Pinnacle Pet, consumer complaints filed with the CPD, and several news articles. *See* Pl.'s Ex. 1-42. And, as noted, the Court heard testimony from Ms. Hancock, Ms. Schmidt, Mr. Flemming, and Mr. Bober, as well as the proffers of other witnesses who were available to testify. *See* ECF 40; ECF 42.

In resolving the Motion, the parties agree that I may rely on plaintiffs' exhibits 1 through 6, which contain the Act's legislative history, including the transcripts of the floor debates, because they constitute adjudicative facts. Conversely, they agree that I may not consider the witness testimony adduced at the P.I. Motion hearing, or the exhibits concerning the plaintiffs' business practices, without converting the Motion to one for summary judgment, which plaintiffs opposed. *See E.I. du Pont de Nemours & Co*., 637 F.3d at 448-49. Because "[s]uch conversion is not appropriate where the parties have not had an opportunity for reasonable discovery," *id.* at 448, I shall not consider the testimony or plaintiffs' exhibits 7 through 42, in resolving the Motion.

### C. Principles of Statutory Construction

The Fourth Circuit has instructed that, when interpreting a state statute, a federal court should "apply the statutory construction rules applied by the state's highest court." *In re DNA Ex Post Facto Issues*, 561 F.3d 294, 300 (4th Cir. 2009); *see Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 489 (4th Cir. 2007). Maryland "follows the general principles of statutory interpretation." *Johnson v. Mayor & City Council of Balt.*, 430 Md. 368, 377, 61 A.3d 33, 38 (2013).

In general, the task of interpreting a statute starts with the text. *Murphy v. Smith*, __ U.S. ___, 138 S. Ct. 784, 787 (2018) ("As always, we start with the specific statutory language in dispute."); *accord United States v. Bryant*, ___ F.3d ___, 2020 WL 398849, at *4 (4th Cir. Jan. 24, 2020). To ascertain a statute's meaning, "'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Gundy v. United States*, ___ U.S. ___, 139 S. Ct. 2116, 2126 (2019) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)). Terms that are not defined are "'interpreted as taking their ordinary, contemporary, common meaning.'" *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted); *accord United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020). Courts may also consider a statute's history and purpose to give effect to its language. *See Gundy*, 139 S. Ct. at 2126. However, courts may "not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994); *see Raplee v. United States*, 842 F.3d 328, 332 (4th Cir. 2016) ("If the meaning of the text is plain . . . that meaning controls.").

In Maryland, the "'cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the General Assembly.'" *Conaway v. State*, 464 Md. 505, 523 212 A.3d 348, 358 (2017) (citation omitted); *see Deville v. State*, 383 Md. 217, 223, 858 A.2d 484, 487

(2004).  To that end, the Maryland Court of Appeals follows a two-step approach.  *See Johnson*, 430 Md. at 377-78, 61 A.3d at 38.  Courts first examine "'the plain meaning of the statutory language[.]'"  *Id.* at 377, 61 A.3d at 38 (citation omitted).  If the language "'is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, [the] inquiry is at an end.'"  *Id.* (citation omitted).  However, if the statute's "'language is ambiguous or unclear, [courts] seek to discern the intent of the legislature from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based.'"  *Id.* (citation omitted).

At the first step, courts "'do not read statutory language in a vacuum,'" nor do they "'confine [their] interpretation of a statute's plain language to the isolated section alone.'" *Williams v. Peninsula Reg'l Med. Ctr.*, 440 Md. 573, 580-81, 103 A.3d 658, 663 (2014) (citation omitted); *see Gundy*, 139 S. Ct. at 2126; *Bryant*, 2020 WL 398849, at *4.  Rather, the statutory language "'must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute.'"  *In re J.C.N.*, 460 Md. 371, 391, 190 A.3d 329, 341 (2018) (citation omitted).  And, a court should strive to "avoid a construction of the statute that is unreasonable, illogical, or inconsistent with common sense."  *Bellard v.* State, 452 Md. 467, 481-82, 157 A.3d 272, 280-81 (2017).

Moreover, the statute must be read "'as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.'"  *Conaway*, 464 Md. at 523, 212 A.3d at 358 (citation omitted); *see Bourgeois v. Live Nation Ent's, Inc.*, 430 Md. 14, 27, 59 A.3d 509, 516 (2013).  As the Maryland Court of Appeals has explained, courts may "'neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language

of the statute.'" *McCloud v. Dep't of State Police, Handgun Permit Review Bd.*, 426 Md. 473, 480, 44 A.3d 993, 997 (2012) (citation omitted).

Of import here, words in a statute are assigned their "ordinary meaning." *Balt. City Det. Ctr. v. Foy*, 461 Md. 627, 645, 197 A.3d 1, 11 (2018). Dictionary definitions may provide a "'useful starting point'" to determine a term's meaning in common parlance. *Montgomery Cty. v. Deibler*, 423 Md. 54, 67, 21 A.3d 191, 198 (2011) (citation omitted); *see also Foy*, 461 Md. at 645, 197 A.3d at 11; *Bottini v. Dep't of Fin.*, 450 Md. 177, 195, 147 A.3d 371, 382 (2016) (using dictionary definition to construe the meaning of the term "money" in a statute). However, dictionary definitions are not necessarily dispositive. *Deibler*, 423 Md. at 67, 31 A.3d at 198. And, when a court turns to a dictionary to clarify a statutory term, the court should endeavor to consult an edition that was extant at the time that the challenged statute was enacted. *Harvey v. Marshall*, 389 Md. 243, 260 n.11, 884 A.2d 1171, 1181 n.11 (2005).

Also of relevance here, Maryland courts recognize the doctrine of *expressio unius est exclusio alterius*, which means "the expression of one thing is the exclusion of another." *See Griffin v. Lindsey*, 444 Md. 278, 288, 119 A.3d 753, 758 (2015); *see also Hudson v. Hous. Auth. of Balt. City*, 402 Md. 18, 30, 935 A.2d 395, 402 (2007) (observing that the doctrine is a "fundamental principle of construction, long recognized in Maryland"). Under this familiar interpretive canon, "statutory lists are often interpreted as exclusive, so that a court will draw the negative inference that no other items may be added." *Potomac Abatement, Inc. v. Sanchez*, 424 Md. 701, 712, 37 A.3d 972, 978 (2012); *see Griffin*, 444 Md. at 288, 119 A.3d at 759 (discussing cases applying the canon); *see also N.L.R.B. v. SW Gen., Inc.*, ___ U.S. ___, 137 S. Ct. 929, 940 (2017); 2A SUTHERLAND STATUTORY CONSTRUCTION § 47:23 (7th ed) (describing the canon's application); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF

Legal Texts 107-11 (2012). That said, the Maryland Court of Appeals has cautioned that the doctrine is merely an interpretive tool that should "'never be applied to override the manifest intention of the Legislature.'" *State v. Neiswanger Mgmt. Servs., LLC*, 457 Md. 441, 479, 179 A.3d 941, 964 (2018) (quoting *Kirkwood v. Provident Sav. Bank of Balt.*, 205 Md. 48, 55, 106 A.2d 103, 107 (1954)).

### III.    Sovereign Immunity

Defendants argue in their submissions that the CPD and the Committee Defendants "are not proper parties" to this suit. ECF 5-1 at 16. According to the State, plaintiffs' claims against these defendants are barred by the Eleventh Amendment. *Id.* Further, the State asserts that the Committee Defendants possess absolute legislative immunity. *Id.* at 17 (citing *Tenney v. Brandhove*, 341 U.S. 367, 372-75 (1951); *Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 470-71 (4th Cir. 2012)). At the hearing, plaintiffs did not press a claim that the CPD and the Committee Defendants are proper parties.

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state, or by Citizens or subjects of any Foreign State." U.S. Const. amend XI. Although, by its express terms, the Eleventh Amendment does not bar suits against a state in federal court by its own citizens, the Supreme Court has extended its protections to apply in such cases. *See Hans v. Louisiana*, 134 U.S. 1, 3 (1890); *see also Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court."). Therefore, a private individual may not sue a state in federal court unless an exception to sovereign immunity applies. *See Coleman v. Court of Appeals of Md.*, 556 U.S. 30, 35 (2012); *Va. Office*

*for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 131 (2011); *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States.") (internal quotation marks and citation omitted); *Edelman v. Jordan*, 415 U.S. 651 (1974).

The Eleventh Amendment did not create sovereign immunity, however. Rather, it preserved the sovereign immunity that the states enjoyed prior to the formation of the Union. *See Alden v. Maine*, 527 U.S. 706, 724 (1999); *see also Sossamon v. Texas*, 563 U.S. 277, 284 (2011). State sovereign immunity "accord[s] states the dignity that is consistent with their status as sovereign entities[.]" *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002).

Of relevance here, state sovereign immunity also bars suit against an instrumentality of a state, sometimes referred to as an "arm of the state," including state agencies. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Pense v. Md. Dep't of Pub. Safety & Corr. Servs.*, 926 F.3d 97, 100 (4th Cir. 2019); *McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014); *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013). State officers sued in their official capacity are also entitled to Eleventh Amendment immunity because such a suit "is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70, (1989); *see also Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

Notably, "[t]he Eleventh Amendment bar to suit is not absolute." *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990). For example, state sovereign immunity does not bar

federal enforcement actions. *Passaro v. Virginia*, 935 F.3d 243, 248 (4th Cir. 2019) (citing *Seminole Tribe*, 517 U.S. at 71 n.14).

The Fourth Circuit has identified three exceptions to the Eleventh Amendment's prohibition of suits against a state or an arm of the state. In *Lee-Thomas v. Prince George's County Public Schools*, 666 F.3d 244 (4th Cir. 2012), the Court said, *id.* at 249 (internal quotation marks omitted):

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363, 121 S. Ct. 955, 148 L.Ed.2d 866 (2001) . . . . Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437, 124 S. Ct. 899, 157 L.Ed.2d 855 (2004). . . . Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618, 122 S. Ct. 1640, 152 L.Ed.2d 806 (2002).

As noted, plaintiffs sued Brian Frosh in his official capacity as the Attorney General of Maryland, the CPD, and two committees of the Maryland General Assembly—the House Economic Matters Committee and the Senate Finance Committee. ECF 1, ¶¶ 10-12. Plaintiffs' suit against Mr. Frosh in his capacity as the Attorney General is tantamount to a suit against the State. *See Will*, 491 U.S. at 70; *see also Weigel v. Maryland*, 950 F. Supp. 2d 811, 831 (D. Md. 2013) (recognizing that suit against the Maryland Attorney General in his official capacity was a suit against the State). The CPD is an entity within the Office of the Attorney General. Md. Code (2013 Repl. Vol.), C.L. § 13-201. Therefore, the CPD is an "arm of the State" for the purposes of the Eleventh Amendment. *See Penhurst,* 465 U.S. at 101-02. So too are the Committee Defendants. *See* Md. Const. art. III, § 1 (establishing the Senate and House of the General Assembly). Thus, defendants are entitled to sovereign immunity under the Eleventh Amendment, unless an exception applies.

The first and third exceptions outlined in *Lee-Thomas* are inapplicable here. Plaintiffs have not identified any federal statute abrogating Maryland's sovereign immunity. Nor do plaintiffs contend that the State has waived its immunity from suit in federal court. However, plaintiffs argue that their suit may proceed under the second exception, known as the *Ex parte Young* exception. ECF 18 at 34-36.

Under the case of *Ex parte Young*, 209 U.S. 123 (1908), "private citizens may sue state officials in their official capacities in federal court to obtain prospective relief from ongoing violations of federal law." *Allen v. Cooper*, 895 F.3d 337, 354 (4th Cir. 2018), *cert. granted*, No. 18-877 (June 3, 2019); *see Stewart*, 563 U.S. at 254-55; *Ex parte Young*, 209 U.S. at 159; *Wright v. North Carolina*, 787 F.3d 256, 261 (4th Cir. 2015); *Hutto*, 773 F.3d at 250; *Antrican v. Odom*, 290 F.3d 178, 184 (4th Cir. 2002). This exception to sovereign immunity "is designed to preserve the constitutional structure established by the Supremacy Clause." *Antrican*, 290 F.3d at 184; *see Stewart*, 563 U.S. at 254-55 (describing the *Ex parte Young* exception as "necessary to 'permit the federal courts to vindicate federal rights'") (citation omitted). It rests on the notion "that a State officer who acts in violation of the Constitution is 'stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.'" *Antrican*, 290 F.3d at 184 (quoting *Ex parte Young*, 209 U.S. at 160); *see Stewart*, 563 U.S. at 255 ("[W]hen a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes.").

To determine whether the *Ex parte Young* exception to Eleventh Amendment immunity applies, "a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (citation omitted). A

"prayer for injunctive relief—that state officials be restrained from enforcing an order in contravention of controlling federal law—clearly satisfies [this] 'straightforward inquiry.'" *Id.* So too does a prayer for a declaratory judgment, because although it may seek relief for past as well as future violations of federal law, "[i]t does not impose *upon* the State 'a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials.'" *Id.* (emphasis in *Verizon*) (quoting *Edelman*, 415 U.S. at 668).

But, this doctrine creates only a "narrow" exception to the Eleventh Amendment. *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993); *see Booth v. State of Md.*, 112 F.3d 139, 142 (4th Cir. 1997) ("*Ex Parte Young* represents a limited exception to Eleventh Amendment immunity[.]"). "To be amenable to suit under the Eleventh Amendment, there must exist a 'special relation' between the state official being sued and the challenged action." *Wright*, 787 F.3d at 261-62 (quoting *Ex parte Young*, 209 U.S. at 157); *see also Hutto*, 773 F.3d at 550; *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008). Such a relationship exists where the state official "has 'some connection with the enforcement of the act.'" *Hutto*, 773 F.3d at 550 (quoting *Ex parte Young*, 209 U.S. at 157); *see also S.C. Wildlife Fed'n*, 549 F.3d at 333. This requirement prevents parties from circumventing a State's Eleventh Amendment immunity by demanding that they identify with some precision the state official tasked with executing the allegedly unconstitutional law. *See Hutto*, 773 F.3d at 550 (citing *Ex parte Young*, 209 U.S. at 157). Thus, "'[g]eneral authority to enforce the laws of the state is an insufficient ground for abrogating Eleventh Amendment immunity.'" *Wright*, 787 F.3d at 261-62 (alteration in *Wright*) (quoting *S.C. Wildlife Fed'n*, 549 F.3d at 333).

Accordingly, the Fourth Circuit has determined that a governor cannot be sued under *ex Parte Young* simply because of his general duty to enforce the state's laws. *See Waste Mgmt.*

*Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001); *accord McBurney v. Cuccinelli*, 616 F.3d 393, 400-02 (4th Cir. 2010). Similarly, the Court has concluded that the *ex Parte Young* exception did not waive the sovereign immunity of the South Carolina State Budget Control Board and its Executive Director where those defendants "ha[d] no role" in implementing the allegedly unconstitutional statute. *Hutto*, 773 F.3d at 551. Conversely, the Court has recognized that a state circuit court clerk "bore the requisite connection to the enforcement of state marriage laws to be enjoined from enforcing them," because the clerk was charged with granting and denying applications for marriage licenses. *See Bostic v. Schaefer*, 760 F.3d 352, 371 n.3 (4th Cir. 2014), *cert. denied*, 574 U.S. 875 (2014). And, the Court has held that the Executive Director of the South Carolina Department of Transportation could be enjoined from constructing a bridge allegedly in violation of federal environmental laws because, under state law, he had "supervisory authority" over the state's participation in environmental impact evaluations. *S.C. Wildlife Fed'n*, 549 F.3d at 333.

In their Complaint, plaintiffs seek a declaration that the Puppy-Mill Act violates the Commerce Clause and the Equal Protection Clause of the Fourteenth Amendment, and they seek an injunction barring the Act's enforcement. ECF 1, ¶¶ 147-54. Thus, the Complaint "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon*, 535 U.S. at 645. But, that does not necessarily mean that plaintiffs may proceed against all defendants under *Ex parte Young*.

It is well settled that *Ex parte Young* applies only to "suits seeking declaratory and injunctive relief against *state officers* in their official capacities." *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 269 (1997) (emphasis added); *see also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) ("To ensure the enforcement of federal law, however, the Eleventh Amendment

permits suits for prospective injunctive relief against *state officials* acting in violation of federal law.") (emphasis added); *Wright*, 787 F.3d at 261 (explaining that the justifications underlying *Ex parte Young* apply to state officials, not states). In contrast, the exception "has no application in suits against the State and their agencies, which are barred regardless of the relief sought." *P.R. Aqueduct & Sewer Auth.*, 506 U.S. at 146 (citing *Cory v. White*, 457 U.S. 85 (1982)).

The CPD and Committee Defendants are not State officials. Therefore, they do not fall within the *Ex parte Young* exception. *See id.*; *accord Lee-Thomas*, 666 F.3d at 249 (observing that the *Ex parte Young* exception was "inapplicable . . . because the complaint does not name as defendants any officials of the State of Maryland"); *Santiago v. N.Y. State Dep't of Corr. Servs.*, 945 F.2d 25, 32 (2d Cir. 1991) (dismissing complaint because "it does not follow the requirement, established in *Ex Parte Young*, that a plaintiff seeking prospective relief from the state must name as defendant a state official rather than the state or a state agency directly"). Therefore, the Eleventh Amendment shields these defendants from plaintiffs' lawsuit.

In contrast, defendants do not contend that Mr. Frosh lacks the requisite relationship to the Puppy-Mill Act such that he is not a proper defendant under *Ex parte Young*. Therefore, the *Ex parte Young* exception applies to Mr. Frosh in his capacity as the Attorney General of Maryland.[7]

Accordingly, I shall dismiss all claims against the CPD and the Committee Defendants. But, plaintiffs' suit may proceed against Mr. Frosh.

## IV.    Failure to State A Claim

Defendants move to dismiss the Complaint on the ground that it fails to state a plausible claim for relief. The State contends that plaintiffs have failed to plead plausible claims under the

---

[7] At oral argument, counsel for the State acknowledged that Mr. Frosh is a proper party to this action.

dormant Commerce Clause because the Puppy-Mill Act neither discriminates against nor burdens interstate commerce. ECF 5-1 at 17-26. The State also argues that plaintiffs' preemption claim falls short because the AWA does not confer a private right of action and, in any event, the Puppy-Mill Act does not obstruct the AWA's licensing scheme. *Id.* at 27-31. Further, the State urges dismissal of plaintiffs' equal protection claim, arguing that plaintiffs have failed to allege a similarly situated comparator group and that the Act easily survives rational basis scrutiny. *Id.* at 31-35. And, the State maintains that plaintiffs have not stated a plausible claim under the Maryland Declaration of Rights, as the Act does not grant an exclusive privilege to sell cats or dogs to any particular market participant. *Id.* at 35-37.

As the Humane Society puts it, the Complaint is "rife with arguments as to the wisdom and efficacy of the [Puppy-Mill] Act, but those arguments do not support their claims of constitutional infirmity." ECF 10 at 3.

### A. Dormant Commerce Clause (Counts I, II, and III)

In Counts I, II, and III, plaintiffs allege that the Puppy-Mill Act violates the Constitution's Commerce Clause. Specifically, Count I asserts that the Act facially discriminates against out-of-state breeders and brokers. ECF 1, ¶¶ 92-102. Count II alleges that the Act discriminates against Maryland retail pet stores. *Id.* ¶¶ 103-09. And, in Count III, plaintiffs allege that the Puppy-Mill Act violates the Commerce Clause because it fails what has come to be known as the *Pike* balancing test. *Id.* ¶¶ 110-23; *see Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

#### 1. The Dormant Commerce Clause

The Commerce Clause grants Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. Although this text is an affirmative grant of power to Congress, the Supreme Court has long held that the Commerce Clause contains a "negative" or

"dormant" corollary that "prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Assoc. v. Thomas*, ___ U.S. ___, 139 S. Ct. 2449, 2459 (2019); *see also South Dakota v. Wayfair*, ___ U.S. ___, 138 S. Ct. 2080, 2090-91 (2018); *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994); *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623-24 (1978). This aspect of the Commerce Clause, generally referred to as the "dormant Commerce Clause," is principally aimed at "prevent[ing] the States from adopting protectionist measures and thus preserves a national market for goods and services." *Tenn. Wine & Spirits*, 139 S. Ct. at 2459; *see Wayfair*, 138 S. Ct. at 2090-91; *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008). By prohibiting state laws that impede interstate commerce, the dormant Commerce Clause acts as an antidote to the "economic Balkanization" that "'had plagued relations among the Colonies and later among the States under the Articles of Confederation.'" *Davis*, 553 U.S. at 338 (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325-26 (1979)).

The Supreme Court has adopted "a two-tiered approach to analyzing state economic regulation under the Commerce Clause." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578-79 (1986); *accord Colon Health Ctrs. of Am., LLC v. Hazel* ("*Hazel II*"), 813 F.3d 145, 152, 156 (4th Cir. 2016); *Sandlands C&D LLC v. Cty. of Horry*, 737 F.3d 45, 51, 53 (4th Cir. 2013); *Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 785 (4th Cir. 1996). First, the court must "ask whether the challenged law discriminates against interstate commerce." *Davis*, 553 U.S. at 338; *see Sandlands C&D*, 737 F.3d at 51. A state law may discriminate in its text, practical effect, or purpose. *Hazel II*, 813 F.3d at 155; *Envtl. Tech. Council*, 98 F.3d at 785. Second, if the law is not discriminatory, the court considers whether the law nonetheless violates the dormant Commerce Clause under the balancing test set forth in *Pike v. Bruce Church, Inc.*,

397 U.S. 137 (1970). *See Hazel II*, 813 F.3d at 155; *Sandlands C&D*, 737 F.3d at 53; *Envtl. Tech. Council*, 98 F.3d at 785.

In the context of the dormant Commerce Clause, discrimination "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys.*, 511 U.S. at 99. As indicated, "[a] state statute may discriminate against interstate commerce in one of three ways: 'facially, in its practical effect, or in its purpose.'" *Hazel II*, 813 F.3d at 152 (quoting *Envtl. Tech. Council*, 98 F.3d at 785); *see also Sandlands C&D*, 737 F.3d at 52. A law's terms may expressly discriminate against out-of-state businesses or give in-state businesses a competitive advantage. *See, e.g.*, *Tenn. Wine & Spirits*, 139 S. Ct. at 2474 (two-year residency requirement to obtain a liquor license); *Granholm v. Heald*, 544 U.S. 460, 476 (2005) (state law allowing in-state wineries, but not out-of-state wineries, to sell wine through the mail); *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 37 (1980) (statute barring out-of-state banks from owning investment advisory businesses within the state). A facially neutral law may also be discriminatory if the law's purpose or effect is to favor in-state businesses. *See, e.g.*, *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 (1994) (milk pricing statute was unconstitutional where its "avowed purpose and its undisputed effect" was to benefit in-state dairy farmers); *Hunt v. Wash. State Apple Advert. Com'n*, 432 U.S. 333 (1947) (statute imposing labeling requirements on produce discriminated in practical effect).

However, "[t]he fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127 (1978). Nor is a statute discriminatory simply because it imposes burdens on a particular business method or operation. *See id.* Although the discrimination test "afford[s] [courts] some latitude to determine for themselves the practical impact of a state

law," it is not unbounded; courts must be careful "not [to] cripple the States' 'authority under their general police powers to regulate matters of legitimate local concern.'" *Hazel II*, 813 F.3d at 152 (quoting *Maine v. Taylor*, 477 U.S. 131, 138 (1986)).

When evaluating whether a law is discriminatory, "a court should focus on discrimination against *interstate commerce*—not merely discrimination against the specific parties before it." *Colon Health Ctrs. of Am., LLC v. Hazel* ("*Hazel I*"), 733 F.3d 535, 543 (4th Cir. 2013) (emphasis in *Hazel I*) (citing *Exxon Corp.*, 437 U.S. at 127). The "principal focus of inquiry must be the practical operation of the statute, since the validity of state laws must be judged chiefly in terms of their probable effects." *Lewis*, 447 U.S. at 37. Therefore, discerning whether a statute is discriminatory may "require[] looking behind the statutory text to the actual operation of the law." *Hazel I*, 733 F.3d at 544.

Laws that discriminate against interstate commerce face "'a virtually *per se* rule of invalidity.'" *Wayfair*, 138 S. Ct. at 2091 (quoting *Granholm*, 544 U.S. at 476). Where "a state law discriminates against out-of-state goods or nonresident economic actors, the law can be sustained only on a showing that it is narrowly tailored to 'advanc[e] a legitimate local purpose.'" *Tenn. Wine & Spirits*, 139 S. Ct. at 2461 (alteration in *Tenn. Wine & Spirits*) (quoting *Davis*, 553 U.S. at 338). To pass constitutional muster, the law must "advance[] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Or. Waste Sys.*, 511 U.S. at 99. And, to be legitimate, the law's purpose must be "unrelated to economic protectionism." *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992).

A law that is not discriminatory but which nonetheless indirectly burdens interstate commerce is subject to *Pike* balancing. *See Hazel II*, 813 F.3d at 155 (citing *Sandlands C&D*, 737 F.3d at 53). Under *Pike* balancing, a court must uphold the challenged law if it "regulates even-

handedly to effectuate a legitimate local public interest . . . unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. The *Pike* Court instructed, *id.*: "If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."

*Pike* balancing is a delicate inquiry. *See Hazel II*, 813 F.3d at 155; *see also Davis*, 553 U.S. at 354 (describing *Pike* as a "very subtle exercise"); ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES § 5.3.5 at 462 (5th ed. 2015) (lamenting that *Pike* "gives courts enormous discretion"). The analysis "frequently requires judges to make highly subjective calls." *Hazel II*, 813 F.3d at 155. And, it is sometimes made "complicated by the difficulty of determining by what criteria benefits and burdens ought to be assessed." *Id.* As Justice Scalia colorfully put it, *Pike* balancing is often "a matter not of weighing apples against apples, but of deciding whether three apples are better than six tangerines." *Davis*, 553 U.S. at 360 (Scalia, J., concurring); *see* CHEMERINSKY, § 5.3.5 at 462 (describing *Pike* balancing as requiring a court to "compar[e] two very different things"). Moreover, even where the alleged benefits and burdens are clearly identified, it may be difficult to conduct the balancing that *Pike* demands from the judicial perch. *See Hazel II*, 813 F.3d at 156 ("Judges are, for better or worse, not often economists or statisticians. . . . Simply put, there are cases in which 'the Judicial Branch is not institutionally suited to draw reliable conclusions of the kind that would be necessary . . . to satisfy a *Pike* burden.'") (quoting *Davis*, 553 U.S. at 353).

The fact-intensive nature of *Pike* balancing "counsels against a premature dismissal" of a complaint. *Hazel I*, 733 F.3d at 546. That said, a complaint alleging a violation of *Pike* balancing

is not inherently immune from judicial scrutiny at the motion to dismiss stage. As the Seventh Circuit has explained, to satisfy Rule 12(b)(6), a plaintiff must "plead specific facts" that the challenged law burdens commerce and that those burdens outweigh the law's benefits. *Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 503 (7th Cir. 2017). Therefore, "conclusory allegations of disparate impact are not sufficient" to survive a motion to dismiss. *Id.*; *accord Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 452 (9th Cir. 2019) (dismissing *Pike* claim where "the complaint fail[ed] to sufficiently allege that the ordinance's effect on interstate commerce clearly outweighs the ordinance's local benefits"); *N.Y. Pet Welfare Ass'n v. City of New York*, 850 F.3d 79, 91 (2d Cir. 2017) (holding that the plaintiff "fail[ed] sufficiently to allege that the burden of selling directly to City pet shops, rather than through distributors, will fall disproportionately on out-of-state breeders").

### 2. Discrimination Against Out-Of-State Breeders and Brokers

In Count I, plaintiffs allege that the Puppy-Mill Act is per se invalid under the Commerce Clause because it discriminates against out-of-state dog breeders and brokers in its text, purpose, and effect. ECF 1, ¶¶ 93-102; *see* ECF 18 at 13-14. The State moves to dismiss Count I on the ground that it is a facially neutral law that does not discriminate in its text, purpose, or effect. ECF 5-1 at 18-24.

#### a. Facial Discrimination

Plaintiffs' facial discrimination theory centers on Section 2 of the Act. ECF 1, ¶¶ 98-99; ECF 18 at 13. As discussed, this uncodified provision of the Act provides, in relevant part, that "it is the intent of the General Assembly that: (1) animal welfare organizations initiate contact with retail pet stores . . . to facilitate collaboration to showcase cats and dogs for: (i) adoption from an

animal control unit or an animal welfare organization; or (ii) purchase from local breeders[.]" 2018 Md. Laws., Ch. 237, § 2.

The terms "showcase" and "local breeders" are undefined in the Act. The term "showcase," when used as a verb, generally means to display something in a favorable light. *See Showcase*, MERRIAM WEBSTER DICTIONARY (defining "showcase" as "to exhibit especially in an attractive light"), *archived at* https://perma.cc/8GZC-ZD7K.[8]

Plaintiffs assert that Puppy-Mill Act is discriminatory on its face because Section 2 "creates an exception" to the Act that favors in-state breeders over out-of-state breeders and brokers. ECF 1, ¶ 98; *see* ECF 18 at 6-14. According to plaintiffs, Section 2 permits only animal welfare organizations to collaborate with pet stores to showcase dogs, and only if those dogs are from an animal shelter, animal control unit, or local breeder. ECF 18 at 8-9. Further, they posit that the term "local" means that "dogs exhibited in retail pet stores in accordance with the [Act] must be sourced from breeders located within the State of Maryland." *Id.* at 9. Thus, plaintiffs contend that Section 2 expressly discriminates against interstate commerce because it allows in-state breeders, but not out-of-state breeders and brokers, to showcase cats and dogs for purchase in Maryland pet stores. *Id.*

The State maintains that the Act does not prohibit showcasing of animals, whether from in-state or out-of-state breeders and brokers. ECF 5-1 at 19. Similarly, at oral argument, the State represented that the Act permits all breeders to showcase cats or dogs.

Any confusion by plaintiffs in construing the Puppy-Mill Act is understandable. It is a poorly drafted statute. But, as the State points out, it does not carve out a special exception for

---

[8] As for the word "local," I pause to note that Maryland borders on Delaware, Pennsylvania, Virginia, and the District of Columbia.

local breeders to sell cats or dogs to Maryland consumers through pet stores.  Nor does the Act preclude out-of-state breeders and brokers from showcasing their animals in Maryland pet stores. As such, the Act does not expressly distinguish between in-state and out-of-state breeders and brokers.

I begin with Section 1 of the Act.  This section is critical, in my view, because it is the only provision in the Act that regulates conduct.  Section 1, codified at Bus. Reg. § 19-703, provides that no pet store may "offer for sale or otherwise transfer or dispose of cats or dogs."  *Id.* § 19-703(a).  To "offer for sale" is defined in § 19-701(f) of the Act.  Specifically, the term "includes to sell, offer to transfer, offer for adoption, advertise for the sale, barter, auction, give away, or otherwise dispose of a domestic animal."  *Id.* § 19-701(f).  Reading these provisions together, § 19-703(a) provides that no retail pet store may sell, offer to transfer, offer for adoption, advertise for the sale, barter, auction, give away, or otherwise dispose of cats or dogs.

Notably, § 19-701(f) does not mention showcasing a cat or dog.  To be sure, the use of the term "includes" in § 19-701(f) could indicate that its list is not exhaustive.  *See United States v. Hawley*, 919 F.3d 252, 256 (4th Cir. 2019) (observing that, in light of "background commentary," the use of the term "including" in a provision of the Sentencing Guidelines was an "'introductory term for an incomplete list of examples'") (citation omitted); 2A SUTHERLAND STATUTORY CONSTRUCTION § 47:7 (instructing that the word "includes" is often a term of enlargement, although "this is not unalterably true").  Here, however, the logical reading of § 19-703(a) is that it does not proscribe showcasing.

Under the familiar interpretive canon of *expressio unius est exclusio alterius*, the absence of the word "showcase" from the list of associated terms in § 19-701(f) suggests that its exclusion was "'by deliberate choice, not inadvertence.'"  *Bruesewitz v. Wyeth* LLC, 562 U.S. 223, 233

(2011) (quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003)); *accord Griffin*, 444 Md. at 288, 119 A.3d at 758. The omission of showcase in § 19-701(f) is especially conspicuous because the General Assembly expressly referenced showcasing both in § 19-703(b) and Section 2. That is significant because it strongly suggests that General Assembly was aware of showcasing and decided not to include it within the meaning of "offer for sale." Thus, it did not ban such conduct. *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (citation omitted); *McCloud*, 426 Md. at 480, 44 A.3d at 997 (courts may "'neither add nor delete language'" to a statute).

This inference is strengthened by § 19-703(b) and Section 2, which encourage pet stores to showcase cats and dogs. Consequently, construing § 19-701(f) to cover showcasing would pit § 19-703(a) against § 19-703(b) and Section 2, an absurd construction of the Act. *Bellard*, 452 Md. at 481-82, 157 A.3d at 280-81. Thus, reading § 19-703(a) in concert with the other provisions of the Act militates against inferring that it limits the showcasing of cats and dogs in pet stores.[9]

Moreover, § 19-703(b) clarifies § 19-703(a). That provision provides that Section 1 "may not be construed to prohibit a retail pet store from collaborating with an animal welfare organization or animal control unit to offer space for these entities to showcase cats or dogs for adoption." Bus. Reg. § 19-703(b). This language does not act as an exception to § 19-703(a) because it does not authorize conduct that qualifies as an "offer for sale"; it only concerns

---

[9] Of course, one can easily envision remunerative schemes between breeders, brokers, and pet stores that would seemingly blur the line between showcasing cats and dogs and offering them for sale. However, as I have observed, the term "showcase" is not defined in the Act. Demarcating the precise contours of that term is a question of State law that I need not answer to resolve this case.

showcasing.  Instead, § 19-703(b) sheds light on § 19-703(a) by making clear that the prohibition contained in § 19-703(a) should "not be construed" to prohibit a particular activity—the showcasing of cats and dogs from animal welfare organizations and animal control units.  Because this is merely clarifying language, § 19-703(b) does not limit *who* can showcase cats and dogs in a Maryland pet store.  That is, the express reference in § 19-703(b) to animal shelters and animal control units does not foreclose pet stores from showcasing animals from other entities, such as breeders and brokers.

Turning to Section 2, the fact that Section 2 is uncodified is of no moment.  *See Doe v. Roe*, 419 Md. 687, 699 n.11, 20 A.3d 787 794 n.11 (2011) (observing that uncodified provisions of a Maryland bill have legal force and effect); DEPARTMENT OF LEGISLATIVE SERVICES, LEGISLATIVE DRAFTING MANUAL 111 (July 2018) ("Provisions of law need not be codified in order to be legally binding.").  But, in contrast to Section 1, Section 2 does not regulate conduct.  By its own terms, Section 2 is merely an aspirational expression of legislative intent.

In particular, Section 2 states that it is the General Assembly's "intent" that animal welfare groups collaborate with pet stores to showcase dogs from three particular sources—animal shelters, animal control units, and "local breeders."  2018 Md. Laws., Ch. 237, § 2.  This language does not compel anyone to act a certain way.  Nor does it prohibit conduct.  And, like § 19-703(b), Section 2 does not purport to limit who can showcase cats and dogs in retail pet stores.  Put simply, Section 2 is all bark and no bite.

On its face, the Act "'visits its effects equally upon both interstate and local business.'" *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 87 (1987) (quoting *Lewis*, 447 U.S. at 36).  Pursuant to § 19-703(a)'s unequivocal language, a Maryland pet store cannot offer "to sell, offer to transfer, offer for adoption, advertise for the sale, barter, auction, give away, or otherwise

dispose of" a cat or dog. That prohibition applies equally to animals bred in Maryland or Missouri. Therefore, breeders and brokers are equally burdened, regardless of whether they are located in Maryland or outside of the State. Conversely, because § 19-703(a) does not cover showcasing, pet stores may showcase cats and dogs from any source. And, although Section 2 expresses the General Assembly's preference that pet stores showcase dogs from local breeders, it cannot be read to impinge on the ability of pet stores to showcase animals from out-of-state breeders.

In sum, the Act neither singles out local breeders for preferential treatment nor specially disadvantages out-of-state breeders. Because the Act's text is neutral in its application towards in-state and out-of-state breeders, plaintiffs have not stated a plausible claim that the Act is facially discriminatory.

### b. Discriminatory Effect

The Complaint alleges that the Act discriminates against out-of-state breeders and brokers because it will "make it impossible" for them "to sell within Maryland under their current business models[.]" ECF 1, ¶ 99. It is certainly plausible that the Act will require out-of-state brokers to change their sales strategy. But, this contention misses the mark because the dormant Commerce Clause "does not protect the participants in intrastate or interstate markets, nor the participants' chosen way of doing business." *Brown v. Hovatter*, 561 F.3d 357, 364 (4th Cir. 2009).

The case of *Exxon Corporation v. Governor of Maryland*, 437 U.S. 117 (1978), is instructive. There, various oil companies challenged a Maryland statute prohibiting producers and refiners of petroleum products, such as Exxon and Shell, from operating retail service stations in Maryland. *Id.* at 125. The plaintiffs argued that the law violated the dormant Commerce Clause because its effect was to insulate in-state independent dealers of gasoline from out-of-state competition. *Id.* However, the Supreme Court rejected this argument, observing that the law

46

"creates no barriers whatsoever against interstate independent dealers; it does not prohibit the flow of interstate goods, place added costs upon them, or distinguish between in-state and out-of-state companies in the retail market." *Id.* at 126. Thus, "[w]hile the refiners will no longer enjoy their same status in the Maryland market, in-state independent dealers will have no competitive advantage over out-of-state dealers." *Id.* "The fact that the burden of a state regulation falls on some interstate companies," the Court continued, "does not, by itself, establish a claim of discrimination against interstate commerce." *Id.*

Further, the Court rejected the plaintiffs' argument that the law had a discriminatory effect because it would result in several businesses ceasing to operate in Maryland. *Id.* at 127. The Court explained that "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another." *Id.* Nor does the Commerce Clause protect "the particular structure or methods of operation in a retail market." *Id.* The Court stressed that "the Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations." *Id.* at 127-28.

The case of *Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495 (7th Cir. 2017), is also pertinent. In that case, two Chicago pet stores and a Missouri dog breeder challenged a Chicago ordinance that limited the particular animals that pet stores could sell to those sourced from animal shelters and animal control units. *Id.* at 497. Among other claims, the plaintiffs asserted that the ordinance violated the dormant Commerce Clause. *Id.* at 498. The Seventh Circuit rejected the plaintiffs' argument that the ordinance had a disparate impact on out-of-state breeders. *Id.* at 502. The court found that "breeders in Illinois enjoy no competive advantage over their counterparts outside of the state because "[a]ll breeders [we]re similarly disadvantaged" by the ordinance. *Id.*

Likewise, here the Puppy-Mill Act does not discriminate in its effect against out-of-state breeders and brokers. The Act does not "does not prohibit the flow of interstate goods, place added costs upon them, or distinguish between in-state and out-of-state companies in the retail market." *Exxon Corp.*, 437 U.S. at 126. As plaintiffs concede, the Act does not prevent breeders and brokers located outside of Maryland from selling cats and dogs to Maryland consumers. *See* ECF 1, ¶ 104; ECF 18 at 20, 30 n.11. Indeed, they have many options for reaching the Maryland pet market, including selling their inventory directly to Maryland residents through the internet, print advertising, or by showcasing animals in pet stores. To the extent that breeders or brokers are excluded from the Maryland marketplace because they do not sell directly to consumers, that is their choice—a proverbial self-inflicted wound. It is of no constitutional import because the Commerce Clause does not protect "particular structure or methods of operation in a retail market." *Exxon Corp.*, 437 U.S. at 127; *see also Brown*, 561 F.3d at 364-65 (rejecting challenge where the plaintiffs' "complaints about the regulation center around . . . the restrictions on how they would prefer to run their businesses").

Nor does the Act confer a competitive advantage to in-state breeders and brokers. Rather, in-state and out-of-state breeders are "similarly disadvantaged" by the Act's across-the-board prohibition on the sale of cats and dogs by retail stores. *Park Pet Shop*, 827 F.3d at 502. And, even if the Act results in some Maryland consumers shifting to in-state dealers or causes some out-of-state dealers to leave the Maryland market, that would not violate the dormant Commerce Clause. *Exxon Corp.*, 437 U.S. at 126-27.

In sum, plaintiffs' allegations concerning the Act's effect on out-of-state breeders and brokers do not amount to a plausible violation of the dormant Commerce Clause.

### c. Discriminatory Purpose

According to plaintiffs, the Act's purpose "is to remove Maryland from the nationwide market of pet sales in stores in hopes of eradicating the so-called puppy mill industry." ECF 1, ¶ 100. This violates the Commerce Clause, plaintiffs assert, because "a State may not achieve a local economic goal by isolating itself from the national economy." *Id.* (citing *City of Philadelphia*, 437 U.S. at 624).

To be sure, the Supreme Court has stated that "[a] finding that state legislation constitutes 'economic protectionism' may be made on the basis of either discriminatory purpose *or* discriminatory effect." *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270-71 (1984) (emphasis added) (internal citations omitted). And, the Court has invalidated statutes where it concluded that the law had both a discriminatory purpose and a discriminatory effect. *See, e.g.*, *W. Lynn Creamery*, 512 U.S. at 194; *Bacchus Imports*, 468 U.S. at 270-71; *Hunt*, 432 U.S. at 352-33.

However, I am not aware of a case in which the Supreme Court struck down a statute solely on the ground that it was motivated by a discriminatory purpose. Indeed, that seem to be contrary to the fundamental principle that the Commerce Clause "regulates effects, not motives[.]" *Comptroller of Treasury of Md. v. Wynne*, ___ U.S. ___, 135 S. Ct. 1787, 1801 n.4 (2015). Thus, there is good reason to doubt that discriminatory purpose alone suffices to invalidate a statute. *See Puppies 'N Love v. City of Phoenix*, 116 F. Supp. 3d 971, 993 (D. Ariz. 2015) ("The Court finds it incongruous to say that a law violates the dormant Commerce Clause merely by having a discriminatory purpose."), *judgment vacated by* 283 F. Supp. 3d 815 (D. Ariz. 2017); *see also All. of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 36 n.3 (1st Cir. 2005); Caleb Nelson, *Judicial Review of Legislative Purpose*, 83 N.Y.U. L. Rev. 1784, 1856 (2008) (noting that "courts rarely have to decide whether a statute can be held unconstitutional solely because of its purpose if the statute

does not actually have the effects that the legislature intended" and that "[s]tatutes that raise this question are presumably rare, and litigants with standing to challenge them might be even rarer").

In any event, plaintiffs' allegations do not state a plausible claim that the Puppy-Mill Act is driven by economic protectionism. Plaintiffs' contention that the Act's "purpose is to remove Maryland from the nationwide market of pet sales," ECF 1, ¶ 100, is undermined by the Act's text and effect, which do not impose barriers on interstate commerce. Moreover, and as even plaintiffs acknowledge, the avowed purpose of the Act is to combat puppy mills. This inescapable conclusion is evident from the General Assembly's name of the law—the "No More Puppy-Mill Pups Act." And, it is bolstered by the testimony of the Act's supporters before the House and Senate Hearings; they focused on the inadequacies of the status quo, the harms created by puppy mills, and the relationship between puppy mills and pet stores.

Accordingly, plaintiffs have failed plausibly to allege that the Act discriminates against out-of-state breeders and brokers in its text, in its effect, or in its purpose. Therefore, I shall dismiss Count I. *See Rosenblatt*, 940 F.3d at 452; *Park Pet Shop*, 872 F.3d 504; *N.Y. Pet Welfare*, 850 F.3d at 91.

### 3. Discrimination Against In-State Retail Pet Stores

In Count II, plaintiffs assert that the Puppy-Mill Act facially discriminates against in-state pet stores "based on the origin of their product." ECF 1, ¶ 106. They allege that the Act is facially discriminatory because it "only prohibits pet stores from selling out-of-state pets." *Id.* ¶ 104. In addition, plaintiffs contend that the Act's effect is to burden interstate commerce because it "cuts off [pet stores'] supply of puppies from traditional, regulated, and legal sources and forces pet stores to obtain their pets from untraditional, unregulated sources, *i.e.*, animal welfare organizations, local hobby breeders, and the internet." *Id.* ¶ 106. Further, they maintain that the

Act violates the dormant Commerce Clause because its purpose is to "prevent competition with out-of-state commercially bred pets, thereby supposedly giving local dogs and cats an increased chance of being adopted." *Id.* ¶ 104.

Contrary to plaintiffs' assertion, the Act does not differentiate between in-state and out-of-state cats and dogs. Here too, plaintiffs' argument is premised on a flawed reading of Section 2.

As discussed, *supra*, the Act does not allow pet stores to sell dogs sourced from "local breeders." Rather, § 19-703(a) forbids Maryland pet stores from selling any cat or dog, without reference to the animal's place of origin, whether in-state or out-of-state. Section 2 does not create an exception to this rule; it merely expresses the legislature's desire to encourage pet stores to showcase animals from local breeders. Because the Act flatly prohibits a retail pet store from selling cats and dogs, it does not distinguish on its face or in effect between animals that originate in state or out-of-state. *See, e.g., Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943 (9th Cir. 2013) (State law prohibiting the sale of foie gras did not discriminate against interstate commerce because it "ban[ned] the sale of both intrastate and interstate products"), *cert. denied*, 574 U.S. 932 (2014); *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 335 (5th Cir. 2007) (holding that statute that "treats both intrastate and interstate trade of horsemeat equally by way of a blanket prohibition" cannot be "considered economic protectionism"), *cert. denied*, 550 U.S. 957 (2007).

Plaintiffs' purpose theory is also without merit. Plaintiffs' single, unadorned assertion that the Act's purpose is to promote animal adoptions by blocking the sale of out-of-state commercially-bred cats and dogs is too conclusory to state a plausible Commerce Clause violation. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. And regardless, the contention that the Act seeks to facilitate pet adoptions by closing off the Maryland pet market to out-of-state breeders is

not plausible.  Indeed, as the Complaint acknowledges in the same paragraph, "out-of-state breeders are still able to sell to Maryland consumers" under the Act.  ECF 1, ¶ 104.

Accordingly, I shall dismiss Count II.

### 4.  *Pike* Balancing

Count III alleges that the Puppy-Mill Act violates the dormant Commerce Clause under *Pike* balancing.  ECF 1, ¶ 112.

As noted, a statute that does not discriminate against interstate commerce may nonetheless violate the Commerce Clause if it fails *Pike* balancing.  *See Pike*, 397 U.S. at 142; *see also United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 346 (2007); *Hazel I*, 733 F.3d at 535; *Yamaha Motor Corp. v. U.S.A. Jim's Motorcycle, Inc.*, 401 F.3d 560, 569 (4th Cir. 2005).  Under the *Pike* balancing test, if a law "effectuate[s] a legitimate public interest," the court must uphold the law unless "the burden imposed on [interstate] commerce is *clearly excessive* in relation to the putative local benefits."  *Pike*, 397 U.S. at 142 (emphasis added).

To determine if a statute has a legitimate purpose, courts "consider whether the legislature had a rational basis for believing there was a legitimate purpose that would be advanced by the statute."  *Yamaha*, 401 F.3d at 560.  This inquiry is analogous to rational basis review.  *See Hazel I*, 733 F.3d at 535 ("The putative benefits of a challenged law are evaluated under the rational basis test, though 'speculative' benefits will not pass muster.") (internal citations omitted).  On the other hand, assessing a law's burdens requires "closer examination . . . especially when the burdens fall predominantly on out-of-state interests."  *Yamaha*, 401 F.3d at 560.

With respect to the Act's benefits, plaintiffs contend that the Act does not serve any legitimate interest because "there is and was no factual evidence to support any connection between Maryland's retail pet stores and the unlicensed and uninspected puppy mills."  ECF 1,

¶ 118. However, under *Pike* balancing, the Act need only advance a "putative" benefit; hard evidence is not required. And, as plaintiffs acknowledge, the Act's putative benefits are legion: "to eradicate so-called 'puppy mills'"; "reduce the number of animals in shelters"; and "protect[] consumers from purchasing unhealthy animals." *Id.* ¶ 119. As discussed in greater detail, *infra*, these are plainly legitimate local interests.

On the other side of the ledger, plaintiffs allege that the Act imposes an "excessive burden on out-of-state regulated breeders and brokers who will be prohibited from selling to any retail pet stores in Maryland," *id.* ¶ 113, and on "pet stores, which will have to completely change their business model of selling pets if they wish to stay in business[.]" *Id.* ¶ 114. These are not burdens for Commerce Clause purposes. The Act forecloses one business strategy, but it does not impair the free flow of goods because out-of-state breeders and brokers can sell their animals directly to Maryland consumers. Although out-of-state dealers that do not sell directly to consumers will feel the effect of the Act more acutely than others, the Commerce Clause does not serve as a safety-net for individual firms nor protect a firm's preferred business methods. *Exxon Corp.*, 437 U.S. at 127. Moreover, the Act predominantly burdens in-state interests. But, the Act's intrastate burdens cannot support a Commerce Clause challenge. Thus, compared to the Act's putative benefits, plaintiffs have not plausibly alleged that the Act imposes burdens on interstate commerce that can be deemed clearly excessive.

As the Ninth Circuit has observed, "only a small number of cases" have invalidated a law under *Pike* balancing, and those cases generally involved state "regulation of activities that are inherently national or require a uniform system of regulation," such as interstate transportation. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012); *see also Ass'n des Eleveurs*, 729 F.3d at 952. The Act does not interfere with activity that is inherently

national or that requires a uniform system of regulation. Indeed, as this case illustrates, the sale of cats and dogs is subject to overlapping local, state, and federal regulation.

In short, plaintiffs have not adequately alleged that the Puppy-Mill Act is the rare statute that regulates evenhandedly but imposes significant burdens on interstate commerce. Because plaintiffs have failed to plead sufficient facts to state a claim under the *Pike* framework, I shall dismiss Count III.

### B. Preemption (Count IV)

Count IV alleges that the Puppy-Mill Act is preempted by the AWA. ECF 1, ¶¶ 124-29. Plaintiffs concede that the AWA contemplates state regulation of commerce in animals. *Id.* ¶ 126. However, they assert that the Act "completely subvert[s]" the AWA by prohibiting USDA licensed dealers to sell cats and dogs in Maryland while excepting from regulation local hobby breeders who are not covered under the AWA. *Id.* ¶ 128. Thus, in their view, the Puppy-Mill Act "conflicts with the AWA and its standards and frustrates Congress's purpose and objectives under the AWA." *Id.* ¶ 129.

"The Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting U.S. Const. Art. VI, cl. 2); *see also Va. Uranium, Inc. v. Warren*, ___ U.S. ___, 139 S. Ct. 1894, 1901 (2019) ("The Supremacy Clause supplies a rule of priority."). As a result, "[w]here state and federal law 'directly conflict,' state law must give way." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011) (citation omitted); *see also Merck Sharp & Dohme Corp. v. Albrecht*, ___ U.S. ___, 139 S. Ct. 1668, 1668 (2019) (observing that "'state laws that conflict with federal law are without effect'") (citation omitted); *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 480 (2013). "Put simply,

federal law preempts contrary state law." *Hughes v. Talen Energy Mktg., LLC*, ___ U.S. ___, 136 S. Ct. 1288, 1297 (2016).

"Federal law may preempt state law under the Supremacy Clause in three ways—by 'express preemption,' by 'field preemption,' or by 'conflict preemption.'" *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 191 (4th Cir. 2007) (citation omitted); *see also Cox v. Duke Energy Inc.*, 876 F.3d 625, 635 (4th Cir. 2017); *Decohen v. Capital One, N.A.*, 703 F.3d 216, 223 (4th Cir. 2012). Express preemption occurs when federal law explicitly preempts state law. *See, e.g.*, *Shaw v. Delta Air Lines, Inc*., 463 U.S. 85, 95-98 (1983). Field preemption applies where "'Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law.'" *Hughes*, 136 S. Ct. at 1297 (citation omitted); *see, e.g.*, *Arizona*, 567 U.S. at 401-02. And, conflict preemption arises where state law "actually conflicts with federal law." *English v. Gen. Elec. Co*., 496 U. S. 72, 79 (1990). These three types of preemption are forms of "ordinary preemption" that serve as federal defenses to a state law claim. *Lontz v. Tharp*, 413 F.3d 435, 441 (4th Cir. 2005); *see Wurtz v. Rawlings Co., LLC*, 761 F.3d 232, 238 (2d Cir. 2014).

Obstacle preemption, a subset of conflict preemption, occurs "where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see also Wyeth v. Levine*, 555 U. S. 555, 563-64 (2009); *Anderson*, 508 F.3d at 191-92. Typically, obstacle preemption arises when a state law "'interferes with the *methods* by which the federal statute was designed to reach [its] goal.'" *Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 829-30 (4th Cir. 2010) (emphasis and brackets in original) (quoting

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992)); *see also Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 141-43 (1963).

Every preemption case is governed by "the two cornerstones of . . . preemption jurisprudence." *Wyeth*, 555 U.S. at 565. First, preemption of state law "is 'fundamentally . . . a question of congressional intent.'" *Cox*, 876 F.3d at 635 (quoting *English*, 496 U.S. at 79); *see Hughes*, 136 S. Ct. at 1297 (observing "'the purpose of Congress is the ultimate touchstone in every pre-emption case'") (citation omitted). Second, respect for our federalist system of government demands that courts presume that Congress did not intend to displace state law. *Wyeth*, 555 U.S. at 565 n.3; *see Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008). The presumption against preemption is especially strong "when Congress has legislated in a field traditionally occupied by the States." *Altria Grp.*, 555 U.S. at 77; *see Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) ("[Courts] start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."); *cf. Hillman v. Maretta*, 569 U.S. 483, 490 (2013) (applying presumption against preemption in case concerning domestic relations, a field historically occupied by the states). In such a case, the statute cannot be set aside absent "clear evidence" of a conflict. *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 885 (2000). These principles apply whether the allegedly preemptive federal law is a statute or a regulation. *See id.* at 874.

The State contests plaintiffs' preemption claim on two grounds. First, defendants contend that plaintiffs lack a cause of action to mount a preemption challenge to the Puppy-Mill Act. ECF 5-1 at 27 (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015)). Alternatively, defendants argue that plaintiffs' manufactured conflict between the Act and the AWA is illusory. *Id.* at 28-31. Plaintiffs acknowledge that the Supremacy Clause does not confer a private right of

action to assert the AWA. ECF 18 at 23. However, they maintain that a preemption claim may proceed in equity under the *Ex parte Young* doctrine. *Id.* And, they argue that the Puppy-Mill Act obstructs the AWA by excluding licensed pet dealers from the Maryland pet market. *Id.* at 25-26.

As a preliminary matter, the case of *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), does not foreclose plaintiffs' preemption claim. There, the Supreme Court held that "the Supremacy Clause is not the 'source of any federal rights,'" and it "certainly does not create a cause of action." *Id.* at 324-25 (quoting *Chapman v. Hous. Welfare Rights Org.*, 441 U.S. 600, 613 (1979)). Accordingly, as a general matter, the Supremacy Clause does not "give affected parties a constitutional . . . right to enforce federal law against the States." *Id.* at 325.

Instead, the Supremacy Clause "instructs courts what to do when state and federal law clash[.]" *Id.* For example, "a court may not convict a criminal defendant of violating a state law that federal law prohibits." *Id.* (citation omitted). Similarly, "a court may not hold a civil defendant liable under state law for conduct federal law requires." *Id.* Thus, although federal preemption cannot be wielded offensively, it can serve as an equitable defense against the state enforcement action. *See Armstrong*, 575 U.S. at 327 ("The ability to sue to enjoin unconstitutional actions . . . is the creation of courts of equity[.]"); John Harrison, *Ex parte Young*, 60 STAN. L. REV. 989, 997-99 (2008).

The law does not compel a plaintiff to wait until he faces prosecution to challenge an allegedly unconstitutional state or local law. Rather, a plaintiff threatened with liability may seek pre-enforcement review. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007). In such cases, a preemption claim also functions as a shield, because it is "nothing more than the pre-emptive assertion in equity of a defense that would otherwise have been available in the State's enforcement

proceedings at law." *See Stewart*, 563 U.S. at 262 (Kennedy, J., concurring). Therefore, a preemption claim asserted in a pre-enforcement challenge is merely a claim in equity for injunctive relief, precisely the cause of action that the Supreme Court recognized in *Ex parte Young. See Armstrong*, 575 U.S. at 326-27 (citing *Ex parte Young*, 209 U.S. at 155-56); *Shaw*, 436 U.S. at 96 n.14 (collecting cases); *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144 (2d Cir. 2016); RICHARD H. FALLON JR. ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 934 (7th ed. 2015).

Plaintiffs have brought a pre-enforcement action, seeking to enjoin the Maryland Attorney General from subjecting them to the Puppy-Mill Act. Therefore, plaintiffs may invoke the Court's equity jurisdiction to challenge the enforcement of the Act, which they allege violates the AWA.[10]

According to plaintiffs, the Puppy-Mill Act is invalid because it obstructs the AWA's licensing system. Evaluating whether a state law stands as an obstacle to federal law "requires 'a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question [of] whether they are in conflict.'" *H&R Block E. Enter., Inc. v. Raskin*, 591 F.3d 718, 723 (4th Cir. 2010) (alteration in *H&R Block*) (quoting *Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co*., 450 U.S. 311, 317 (1981)). Mere "tension" between the federal and state law is insufficient. *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 256 (1984). Rather, a conflict exists "only where the repugnance or conflict is so 'direct and positive' that the two acts cannot 'be reconciled or consistently stand together.'" *Jones v. Rath Packing Co.*, 430 U.S. 519, 544 (1977) (Rehnquist, J., dissenting in part and concurring in part) (quoting *Kelly v. Washington*, 302 U.S. 1, 10 (1937)).

---

[10] In *Armstrong*, the Supreme Court observed that the "power of the federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." 575 U.S. at 327. Defendants do not assert here that the AWA precludes equitable relief.

In *New York Pet Welfare Association, Inc. v. City of New York*, 850 F.3d 79 (2d Cir. 2017), the Second Circuit examined a preemption challenge in an analogous setting. In that case, the plaintiffs, a collection of pet stores, challenged a New York City ordinance requiring pet shops to sell only animals acquired from dealers holding Class A licenses. They argued, *inter alia*, that the ordinance interfered with the AWA's licensing system. *Id.* at 86. Whether the ordinance clashed with the AWA, the Second Circuit explained, turned on whether it "block[ed] the licensure system from fulfilling the specific role that Congress and the Secretary of Agriculture intended to play in advancing the goals of the AWA." *Id.* at 87.

The court found that "careful analysis" of the AWA revealed that it was "best understood as a system of compulsory registration designed to require dealers to provide information that would facilitate the Act's objective of creating a nationwide system of animal welfare inspections." *Id.* at 88. The ordinance posed no obstacle to this scheme because "[b]reeder's and distributor's ability to sell to City pet shops has no bearing on the licensing scheme's ability to facilitate federal enforcement activities." *Id.* As the court noted, "[d]istributors will still have to get licenses, will still have to provide information to federal officials, and will still have to open their facilities to federal inspection," while "exempt breeders will still be excluded from the licensing system as a matter of federal law." *Id.* at 88-89. Thus, the Second Circuit affirmed the district court's dismissal of the plaintiffs' preemption claim. *Id.* at 89.

For the same reasons outlined in *New York Pet Welfare*, plaintiffs have failed to identify an "actual conflict between the two schemes of regulation." *Fla. Lime*, 373 U.S. at 141. The AWA's purpose is to foster the humane treatment of animals, not to protect the commercial interests of breeders and brokers. *See* 7 U.S.C. § 2131; *see also Zimmerman v. Wolff*, 622 F. Supp. 2d 240, 248 (E.D. Pa. 2008) ("The objective of the AWA is not to permit an owner to practice in

interstate commerce; it is to protect the animals that are bought, sold and transported in interstate commerce.").  To effectuate this purpose, the AWA directs the USDA Secretary to create a licensure system, issue regulations governing the treatment and transportation of animals, and to proactively conduct inspections of breeding facilities. 7 U.S.C. §§ 2133, 2143, 2146.

Prohibiting Maryland pet stores from selling dogs or cats has no effect on the operation of the AWA.  The Puppy-Mill Act's impact on pet stores does not clash with the AWA, because pet stores are explicitly exempt from the AWA.  *See* 7 U.S.C. § 2132(f).  On the other hand, breeders and brokers who sell to Maryland consumers and who fall within the AWA's sweep "will still have to get licenses, will still have to provide information to federal officials, and will still have to open their facilities to federal inspection." *N.Y. Pet Welfare*, 850 F.3d at 88.  Thus, the Act in no way stands as an obstacle to the AWA's system of licensing and inspection.

The AWA's provision for state and local regulation of animal sales further counsels against preemption.  "'The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them.'" *Wyeth*, 555 U.S. at 575 (alteration and citation omitted).  That is precisely the situation here.  The AWA states: "The Secretary is authorized to cooperate with the officials of the various States or political subdivisions thereof in carrying out the purposes of [the AWA] and of any State, local, or municipal legislation or ordinance on the same subject." 7 U.S.C. § 2145(b).  And, the AWA unambiguously envisions state and local action, providing that the USDA's regulations "shall not prohibit any State (or political subdivision of such State) from promulgating standards in addition" to its own. *Id.* § 2143(a)(8).  That the AWA covers a matter historically within the states' police

powers also weighs against preemption. *Cf. Reid v. Colorado*, 187 U.S. 137, 148 (1902) (upholding state statute regulating trade in cattle and horses).

Notably, courts have consistently rejected the claim that the AWA preempts a state or local animal law, even those that ban activity otherwise permitted under the AWA. *See N.Y. Pet Welfare*, 850 F.3d at 89; *DeHart v. Town of Austin*, 39 F.3d 718, 722 (7th Cir. 1994) (ordinance prohibiting the possession of exotic animals); *Mo. Pet Breeders Assoc. v. Cty. of Cook*, 106 F. Supp. 3d 908, 918 (N.D. Ill. 2015) (ordinance limiting pet stores to selling animals sourced from Class A licensees with fewer than five female animals); *Zimmerman*, 622 F. Supp. 2d at 247-48 (state law precluding plaintiff from breeding dogs); *Am. Canine Found. v. Sun*, C-06-4713 MMC, 2007 WL 4208358, at *5 (N.D. Cal. Nov. 27, 2007) (spaying and neutering ordinance); *Kerr v. Kimmell*, 740 F. Supp. 1525, 1529-30 (D. Kan. 1990) (state licensing scheme for dog breeders).

Accordingly, I shall dismiss plaintiffs' preemption claim in Count IV.

### C. Equal Protection (Count V)

Count V alleges that the Puppy-Mill Act deprives plaintiffs of their constitutional right to the equal protection of law, in violation of the Fourteenth Amendment to the Constitution. ECF 1, ¶¶ 130-36. According to plaintiffs, the Act violates equal protection because it "treats Plaintiffs differently than others similarly situated," *id.* ¶ 132, and "[t]here is no legitimate State interest in banning retail pet store sales, as no evidence has been shown whatsoever to support the purported interest in reducing 'puppy mills' through a ban." *Id.* ¶ 133.

The Fourteenth Amendment's Equal Protection Clause states: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This guarantee "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To prevail on an equal

protection challenge, a plaintiff "'must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'" *Kolbe v. Hogan*, 849 F.3d 114, 146 (4th Cir. 2017) (en banc) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)). If that showing is made, the court "'proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny.'" *Kolbe*, 849 F.3d at 146 (quoting *Morrison*, 239 F.3d at 654).

Classifications that occur along the axis of race, alienage, or national origin are subject to strict scrutiny because such factors are "seldom relevant to the achievement of any legitimate state interest" and, instead, more likely "reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others." *City of Cleburne*, 473 U.S. at 440. A law survives strict scrutiny "only if [it is] suitably tailored to serve a compelling state interest." *Id.* Laws that apply to a quasi-suspect class, such as gender, receive intermediate scrutiny. *Id.*

In contrast, a classification that neither proceeds along suspect lines nor impinges on a fundamental right does not ordinarily raise concerns. *See Armour v. City of Indianapolis*, 566 U.S. 673, 680 (2012); *FCC v. Beach Commc'ns*, 508 U.S. 307, 314-15 (1993); *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487 (1955); *accord Kolbe*, 849 F.3d at 146 n.17; *Pulte Home Corp. v. Montgomery Cty.*, 909 F.3d 685, 693 (4th Cir. 2018); *Seina Corp v. Mayor & City Council of Rockville Md.*, 873 F.3d 456, 465 (4th Cir. 2017); *Tri-Cty. Paving, Inc. v. Ashe Cty.*, 281 F.3d 430, 438 (4th Cir. 2002). That is because, "[w]hen social or economic legislation is at issue, . . . the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne*, 473 U.S. at 440 (internal citations omitted). Thus, such classifications receive only rational basis review. *Beach Commc'ns*, 508 U.S. at 313; *see also City of Cleburne*, 473 U.S. at 440; *Kolbe*, 849 F.3d at 146; *Pulte Home*, 909 F.3d at 693.

Under the rational basis standard, the challenged statute is entitled to a "strong presumption of validity." *Beach Commc'ns*, 508 U.S. at 315; *City of Cleburne*, 473 U.S. at 440. The statute need only be "'rationally related to a legitimate state interest.'" *Pulte Home*, 909 F.3d at 693 (quoting *Seina*, 873 F.3d at 465). A law clears this hurdle "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Commc'ns*, 508 U.S. at 313. Given this low bar, invalidating a statute subject to rational basis review is a tall order: the plaintiff must "'negate every conceivable basis which might support the legislation.'" *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (quoting *Lehnhausen v. Lake Shore Auto Parts Co*., 410 U.S. 356, 364 (1973)); *see also Armour*, 566 U.S. at 681.

To satisfy rational basis scrutiny, "a government entity 'need not actually articulate at any time the purpose or rationale supporting its classification,' and it is not required to produce evidence showing the rationality of its classification." *Pulte Home*, 909 F.3d at 693 (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). Rather, the government's legitimate interest "may be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315. Further, this test "is not a subjective one." *Pulte Home*, 909 F.3d at 693. In other words, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Beach Commc'ns*, 508 U.S. at 315; *see Tri-Cty. Paving*, 281 F.3d at 439.

Rational basis review is a "paradigm of judicial restraint." *Beach Commc'ns*, 508 U.S. at 314. Because "'[p]erfection in making the necessary classifications is neither possible nor necessary,'" *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981) (citation omitted), a statute "does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Dandridge v. Williams*, 397 U.S. 471, 485

(1970) (citation omitted).  Further, rational basis review "is not license for courts to judge the wisdom, fairness, or logic of the legislative choices." *Beach Commc'ns*, 508 U.S. at 313.  Indeed, "[a]s long as the classificatory scheme chosen by [the legislature] rationally advances a reasonable and identifiable governmental objective, [judges] must disregard the existence of other methods of allocation that we, as individuals, perhaps would have preferred." *Schweiker*, 450 U.S. at 235.

Despite this deference, the scrutiny required by rational basis review "is not a toothless one." *Mathews v. Lucas*, 427 U.S. 495, 510 (1976).  To pass muster, the law "must find some footing in the realities of the subject addressed by the legislation." *Heller*, 509 U.S. at 321.  And, the government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne*, 473 U.S. at 446; *Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71, 83 (1988) ("[A]rbitrary and irrational discrimination violates the Equal Protection Clause under even our most deferential standard of review.").  Moreover, some interests, such as "irrational prejudice," *City of Cleburne*, 473 U.S. at 450, or a "desire to harm a politically unpopular group," *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), are simply not legitimate.

Of course, at the Rule 12(b)(6) stage, the plaintiff need not prove that the challenged statute, in fact, violates equal protection.  *Giarratano*, 521 F.3d at 304.  But, the Fourth Circuit has instructed that, to withstand a motion to dismiss, a plaintiff "'must plead sufficient facts to overcome the presumption of rationality that applies to government classifications.'"  *Id.* (quoting *Wroblewski v. City of Washburn*, 965 F.2d 452, 460 (7th Cir. 1992)).  For example, the Fourth Circuit has held that a plaintiff's "conclusory allegation" that the challenged action was irrational was "insufficient to plausibly state a claim for relief in light of the strong presumption in favor of the legislation's rationality and the readily apparent justification for the legislation." *Giarratano*,

521 F.3d at 304. Notably, this approach comports with that adopted by other circuits. *See Progressive Credit Union v. City of New York*, 889 F.3d 40, 50 (2d Cir. 2018); *In re City of Detroit*, 841 F.3d 684, 701 (6th Cir. 2016); *Dixon v. District of Columbia*, 666 F.3d 1337, 1342 (D.C. Cir. 2011); *Flying J. Inc. v. City of New Haven*, 549 F.3d 538, 546 (7th Cir. 2008); *Teigen v. Renfrow*, 511 F.3d 1072, 1083 (10th Cir. 2007).

Moreover, a court "is not confined to the particular rational or irrational purposes that may have been raised in the pleadings." *Progressive Credit Union*, 889 F.3d at 50. The Fifth Circuit has said: "When applying rational basis doctrine to a dismissal for failure to state a claim, a legislative classification must be treated as valid 'if a court is able to hypothesize a legitimate purpose to support the action.'" *Glass v. Paxton*, 900 F.3d 233, 244-45 (5th Cir. 2018) (citation omitted); *cf. Applegate, LP v. City of Frederick*, 179 F. Supp. 3d 522, 5333 (D. Md. 2016) (dismissing equal protection claim "because the City can articulate a rational basis for its classification").

The parties agree that rational basis review is the appropriate standard. *See* ECF 1, ¶ 132; ECF 5-1 at 32. And, the parties do not dispute the basic formulation of the test—that a statute will be upheld if it "is rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440. They agree on little else.

At the outset, plaintiffs argue that the Puppy-Mill Act is "subject to heightened review" because it was motivated by "'bare animus' towards retail pet stores[.]" ECF 18 at 30. To support that position, plaintiffs rely on the Act's legislative history, which they claim "is telling as to the animus shown to retail pet stores without reason." *Id.* at 31. The State counters that heightened scrutiny is unwarranted because the Act advances numerous legitimate interests. ECF 24 at 11.

Plaintiffs endeavor to invoke a line of cases in which the Supreme Court struck down state or federal acts dealing with non-suspect groups because they were motivated by animus. *See generally* Dale Carpenter, Windsor *Products: Equal Protection from Animus*, 2013 SUP. CT. REV. 183; Susannah W. Pollvogt, *Unconstitutional Animus*, 81 FORDHAM L. REV. 887 (2012). In these cases, the Court departed from conventional rational basis review to scrutinize the motivations behind the challenged law, giving rise to a standard of review that has been variously characterized as "heightened rational-basis review," "rational basis with bite," "rational basis with teeth," or "rational basis plus." *Bishop v. Smith*, 760 F.3d 1070, 1099 (10th Cir. 2014) (Holmes, J., concurring) (citations and internal quotation marks omitted).

The animus cases trace their origin to *United States Department of Agriculture v. Moreno*, 413 U.S. 528 (1973). There, the Supreme Court declared that an amendment to the Food Stamp Act of 1964, which made food stamps available to households of related persons but not to households of unrelated persons, violated equal protection because the amendment's legislative history revealed that Congress passed it "to prevent so-called 'hippies' and 'hippie communes' from participating in the food stamp program." *Id.* at 534. The Court explained that, "if the constitutional conception of equal protection of the laws means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Id.* "'As a result, [the] purpose to discriminate against hippies cannot, in and of itself and without reference to some independent considerations in the public interest, justify the [classification].'" *Id.* at 534-35 (citation omitted).

Likewise, in *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985), the Court struck down a municipal zoning ordinance requiring special-use permits for the operation of a group home for the intellectually disabled. *Id.* at 448. The Court ruled that mental disability was

not a suspect or quasi-suspect class. *Id.* at 442-47. Nonetheless, the Court found that the permitting requirement was unconstitutional because "mere negative attitudes" and "irrational prejudice" were not permissible bases for distinguishing between the group home and other dwellings. *Id.* at 448, 450.

The Supreme Court has also applied this "more searching form of rational basis review" to laws that discriminated against gays and lesbians. *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring). In *Romer v. Evans*, 517 U.S. 620 (1996), the Court struck down an amendment to the Colorado Constitution repealing any ordinance or law prohibiting discrimination against gays and lesbians. *Id.* at 624, 636. The amendment's "sheer breadth [wa]s so discontinuous with the reasons offered"—protecting landlords and employers religiously opposed to homosexuality—that the Court concluded that the amendment was "inexplicable by anything but animus toward the class it affects[.]" *Id.* at 632. Similarly, in *United States v. Windsor*, 570 U.S. 744 (2013), the Supreme Court invalidated Section 3 of the Defense of Marriage Act ("DOMA"), which defined marriage for the purposes of federal law as a heterosexual union. *Id.* at 775. Observing that DOMA's purpose was to "identify a subset of state-sanctioned marriages and make them unequal," *id.* at 772, the Court held that the law violated the equal protection component of the Fifth Amendment because "no legitimate purpose overcomes the purpose and effect to disparage and to injure those whom the State, by its marriage laws, sought to protect in personhood and dignity." *Id.* at 775.

The upshot of these cases is that neither unfounded antipathy nor outright hostility may serve as the basis for a law. *Compare Cleburne Living Ctr.*, 473 U.S. at 448, *with Moreno*, 413 U.S. at 534. Thus, if the law's sole rationale is animus, it *ipso facto* fails to advance a legitimate interest and must fall. In contrast, where there is no evidence that the law is infected with animus,

heightened rational basis review is inappropriate.  *See, e.g.*, *Gallinger v. Becerra*, 898 F.3d 1012, 1021 (9th Cir. 2018) (declining to apply heightened rational basis where plaintiffs failed to plausibly plead that the legislature acted with a desire to harm); *Carney v. Okla. Dep't of Pub. Safety*, 875 F.3d 1347, 1354 (10th Cir. 2017) (state sex offender registration law "is not an aberrational law indicative of hostile lawmaking," and therefore "our analysis rests upon traditional rational basis review").  And, some courts have held that heightened rational basis review is inapplicable where the legislature had an independent justification for the law.  *See Flying J*, 549 F.3d at 547 ("It is only when courts can hypothesize no rational basis for the action that allegations of animus come into play."); *Gallagher v. City of Clayton*, 699 F.3d 1013, 1020 (8th Cir. 2012) (stating that "a *Romer*-type analysis only applies where there is no other legitimate state interest for the legislation that survives scrutiny" and thus, because ordinance banning outdoor smoking had a health-based justification, it was "not the product solely of animus so as to fall within the *Romer* ambit").

Applying these principles here, plaintiffs' equal protection claim is subject to traditional principles of rational basis review.  This case shares little in common with *Moreno*, *Cleburne*, *Romer*, or *Windsor*.  The Act does not implicate an immutable characteristic, such as mental disability or sexual orientation.  *See* Raphael Holoszyc-Pimentel, Note, *Reconciling Rational-Basis Review: When Does Rational Basis Bite?*, 90 N.Y.U. L. Rev. 2070, 2085-89 (2015) (finding that heightened rational basis is generally limited to cases involving immutable traits).  The Act's effect—banning a particular class of vendors from selling certain products—is not "unprecedented in our jurisprudence."  *Romer*, 517 U.S. at 633; *see, e.g.*, *Chinatown Neighborhood Ass'n, v. Harris*, 794 F.3d 1136 (9th Cir. 2015) (banning the sale of shark fins); *Assoc. de Eleveurs*, 729 F.3d at 952 (banning the sale of foie gras); *Empacadora de Carnes de Fresnillo*, 476 F.3d at 336

(banning the sale of horsemeat). It does not have the "peculiar property" of stripping a particular group of special privileges or protections afforded to others. *Romer*, 517 U.S. at 632. Whereas DOMA intruded on the states' traditional police power to regulate domestic regulations, the Puppy-Mill Act is an exercise of Maryland's core police powers. *See Windsor*, 570 U.S. at 768-72. And, as discussed, *infra*, it simply cannot be said that the Act is "inexplicable by anything but animus," *Romer*, 517 U.S. at 632, because the State has advanced numerous legitimate interests to justify the Act.

At oral argument, plaintiffs' counsel contended that the Act's floor debates evidence an intent by the General Assembly to harm pet stores. In particular, plaintiffs cited derogatory statements made by Delegate Kramer on the floor of the General Assembly, calling puppy mills "horror shows," a "disgusting trade," and an "abomination." Pl.'s Ex. 4 at HB1662_000456. But, Delegate Kramer's statements were directed at certain kinds of breeders, not Maryland pet stores. And, notwithstanding Delegate Kramer's strong language, numerous courts have recognized that addressing irresponsible animal breeding is a legitimate state interest. *See, e.g.*, *Park Pet Shop*, 872 F.3d at 504; *Puppies 'N Love*, 116 F. Supp. 3d at 997; *Mo. Pet Breeders Assoc.*, 106 F. Supp. 3d at 920.

Ultimately, plaintiffs' argument boils down to the contention that by siding with animal-rights groups, the General Assembly sought to injure pet stores. This argument is without merit. Siding with one group does not necessarily signify hostility towards another. *See, e.g.*, *Gallinger*, 898 F.3d at 1020 ("Accommodating one interest group is not equivalent to intentionally harming another."); *Desoto CAB Co., Inc. v. Picker*, 228 F. Supp. 3d 950, 959 (N.D. Cal. 2017 ) ("Animus is ill will or hostility, and is not simply the converse of favoritism towards another.") (internal citation omitted). That is true here, where the Act's supporters testified, perhaps mistakenly, that

the Puppy-Mill Act would not harm pet stores. *See* ECF 18-3 at 9 (Ms. Hovermale: "This legislation would require pet stores to adhere to a humane business model, not put them out of business."); *id.* at 11 (Ms. Jesse: "[The HSUS] for free will assist pet stores with transforming their business to an adoption model."); *id.* at 11 (President of Relove Animals: "We are not trying to put these people out of business."). Accordingly, plaintiffs have not stated a colorable claim that the Act is infected by animus so as to justify the more searching variant of rational basis review.

Under traditional rational basis review, plaintiffs have failed to plead a plausible equal protection violation. Their claim falters at the starting gate because they do not identify a similarly situated comparator group. The Complaint merely alleges that the Puppy-Mill Act "treats Plaintiffs differently than others similarly situated[.]" ECF 1, ¶ 132. But, it is axiomatic that "[t]hreadbare recitals of the elements of a cause of action" do not satisfy Rule 8. *Iqbal*, 556 U.S. at 678. Thus, plaintiffs' conclusory assertion does not come close to pleading a plausible equal protection claim.

At oral argument, plaintiffs sought to compare themselves to breeders. To be considered "similarly situated," the plaintiff must "identify persons materially identical to him or her who has received different treatment." *Kolbe v. Hogan*, 813 F.3d 160, 185 (4th Cir. 2016), *vacated on other grounds*, 849 F.3d 114 (4th Cir. 2017) (en banc). Although the standard does not condone fine-grained distinctions, it does require an "'extremely high degree of similarity.'" *Kolbe*, 813 F.3d at 185 (quoting *Willis v. Town of Marshall*, 275 F. App'x 227, 233 (4th Cir. 2008)).

Pet stores and breeders are far from materially identical. Commercial dog breeders are federally regulated. And, for breeders who sell to consumers, the consumer generally has an

opportunity to inspect the provenance of their pet.[11]  In contrast, pet stores are not federally regulated, and their inventory comes from other sources.  These are material differences: breeders and pet stores occupy opposite ends of the pet supply chain, are subject to different degrees of regulatory oversight, and present distinct consumer protection issues.  Thus, comparing pet stores to breeders is like saying a tiger is similarly situated to a chihuahua because both have four legs and are carnivores.  *See*, *e.g.*, *Perfect Puppy, Inc. v. City of E. Providence*, 98 F. Supp. 3d 408, 418-19 (D. R.I. 2015) (rejecting allegation that animal shelters and pet stores are similarly situated because both participate in the pet market); *Maryeli's Lovely Pets, Inc. v. City of Sunrise*, 14-61391-Civ-Scola, 2015 WL 11197773, at *3 (S.D. Fla. June 25, 2015) (same).

Even assuming, *arguendo*, that pet stores and breeders are similar for purposes of analysis, plaintiffs' claim still fails because the record contains ample facts that provide a rational basis for the Puppy-Mill Act.  The General Assembly heard testimony that the USDA's regulations and Maryland's regulatory scheme were insufficient to ensure the humane treatment of dogs and cats.  To illustrate, Delegate Kramer testified that USDA had roughly 100 inspectors for over 8,000 facilities.  ECF 18-3 at 5.  And, Ms. Jesse testified that, despite Maryland's reporting regulations, pet stores, including Just Puppies, continued to source dogs from "notorious" puppy mills.  *Id.* at 10.  In addition, the General Assembly heard testimony that pet store dogs sourced from puppy mills posed a public health risk, citing a recent study tracing an outbreak of drug-resistant bacteria to a pet-store puppy.  *Id.* at 9.  And, the General Assembly received evidence concerning the significant number of cats and dogs housed in Maryland animal shelters.  *Id.* at 12.

---

[11] Of course, some consumers buy dogs from breeders whose locations do not lend themselves to inspection prior to purchase.

Protecting consumers, reducing financial support for mill breeders, and encouraging pet adoption are indisputably legitimate state interests. *See United States v. Stevens*, 558 U.S. 460, 469 (2010) ("[T]he prohibition of animal cruelty itself has a long history in American law, starting with the early settlement of the Colonies."); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 538 (1993) (recognizing "protecting the public health and preventing cruelty to animals" as legitimate state interests); *Park Pet Shop*, 872 F.3d at 504 ("The City's policy goals are to reduce financial support for mill breeders, curb the emotional and financial burdens on consumers who unwittingly buy mill-bred pets, and reduce the cost of sheltering and euthanizing unwanted problem pets. These are unquestionably legitimate governmental interests . . . ."); *N.Y. Pet Welfare Assoc., Inc. v. City of New York*, 143 F. Supp. 3d 50, 65 (E.D.N.Y. 2015) (reducing pet homelessness and euthanasia are legitimate interests), *aff'd*, 850 F.3d 79 (2d Cir. 2017); *Perfect Puppy*, 98 F. Supp. 3d at 420 ("A government's interest in preventing the evils associated with 'puppy mills' that both parties cite to, including inhumane treatment of animals and overpopulation, are plainly legitimate ends.").

Moreover, the General Assembly could rationally conclude that banning the sale of cats and dogs in stores would advance its interests. By removing pet stores from the supply chain for cats and dogs, the Act may make it more difficult for irresponsible breeding operations to evade scrutiny. By eliminating one purveyor of cats and dogs, the Puppy-Mill Act may nudge consumers towards shelters, thereby increasing adoptions and reducing the euthanasia rate. At a minimum, the Act removes Maryland pet stores as a source of income for puppy-mills, thereby advancing the General Assembly's goal of preventing animal cruelty. *See Park Pet Shop*, 872 F.3d at 504; *N.Y. Pet Welfare*, 143 F. Supp. 3d at 65; *Perfect Puppy*, 98 F. Supp. 3d at 420; *see also Assoc. de Eleveurs*, 729 F.3d at 952; *Empacadora de Carnes de Fresnillo*, 476 F.3d at 336.

Perhaps for these reasons, plaintiffs rabidly attack the Puppy-Mill Act's efficacy and evidentiary basis. ECF 1, ¶¶ 133-35. There are certainly grounds to support plaintiffs' belief that, in effect, the cure is worse than the disease.[12] But, whatever the Act's soundness, that is a judgment committed to the legislature. Rational basis review merely asks whether a law is founded on a "conceivable state of facts," not whether it is empirically correct or effective in practice. *Beach Commc'ns*, 508 U.S. at 313 ("[E]qual protection is not license for courts to judge the wisdom, fairness, or logic of the legislative choices."); *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) ("Legislatures may implement their program step by step, in . . . economic areas, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations.") (internal citation omitted); *Brown*, 561 F.3d at 369. Nor does absence of empirical data render the Act defective. *Beach Commc'ns*, 508 U.S. at 315. If the public disagrees with the Puppy-Mill Act, its power may be found at the ballot box.

Therefore, for the reasons stated above, Count V is subject to dismissal.

### D. Maryland Declaration of Rights (Count VI)

Count V asserts that the Act creates a monopoly prohibited by Article 41 of the Maryland Declaration of Rights. ECF 1, ¶¶ 137-45; *see* Md. Decl. of R. art. 41. Article 41 declares: "That monopolies are odious, contrary to the spirit of a free government and the principles of commerce, and ought not to be suffered."

---

[12] There are numerous arguments for why the Act is ill-conceived. For example, the Act may shutter the few Maryland retail pet stores that previously sold cats and dogs. In turn, this will result in the loss of jobs, deprive the State of income tax and sales tax revenue, and affect landlords who own the buildings housing the stores. It may also cause Maryland residents to travel to other states to obtain the pets of their choice. And, far from shielding consumers, it may drive them to the internet, where pet sales are not regulated. Moreover, the Act appears premised on the unverified belief that all small breeders are caring ones.

According to plaintiffs, the Puppy-Mill Act "creates a monopoly by explicitly banning pet stores from selling all pets, except those pets obtained from unregulated 'local breeders' or unregulated rescue or animal shelters." ECF 1, ¶ 140. Further, plaintiffs maintain that the Act suppresses competition between pet stores and local breeders and animal shelters as well between out-of-state breeders and local breeders and animal shelters. *Id.* ¶¶ 143-44. The result, assert plaintiffs, is that "Maryland consumers will no longer have the freedom to engage in the trade or commerce of pet sales through Maryland pet stores." *Id.* ¶ 145.

Although Article 41 has been part of the Maryland Constitution since 1776, the Maryland Court of Appeals has recognized that there is "some question as to whether its ban extends to anything other than monopolies in the strict sense, that is, an exclusive right or privilege granted by the sovereign." *Grempler v. Multiple Listing Bureau of Harford Cty., Inc.*, 258 Md. 419, 424, 266 A.2d 1, 4 (1970); *see also Supermarkets Gen. Corp. v. State*, 286 Md. 611, 626, 409 A.2d 250, 258 (1979). A survey of pertinent cases helps to illuminate the contours of Article 41.

To my knowledge, the Maryland Court of Appeals first opined on the meaning of Article 41 in the case of *Broadway & Locust Point Ferry Company v. Hankey*, 31 Md. 346 (1869). There, the court cursorily rejected a challenge to a State law granting a ferry boat company the exclusive right to use a wharf. *Id.* at 349. The court found that the charter "[wa]s not a monopoly in any sense; but a privilege conferred on the company to be exercised for the public benefit[.]" *Id.* "[S]uch a grant by this Legislature," the court stated, "has never been considered as creating a monopoly[.]" *Id.*

The court next addressed Article 41 in *Wright v. State*, 88 Md. 436, 41 A. 795 (1898). In *Wright*, the State prosecuted Peter Wright for violating a statute prohibiting the production and sale of oleomargarine. On appeal, Wright argued, *inter alia*, that the statute violated Article 41

because it conferred a monopoly on dairy farmers.  *See id.* at 41 A. at 796, 798.  The Court of

Appeals observed that in the case of *United States v. E.C. Knight Co.*, 156 U.S. 1, 15 (1895), Chief

Justice Fuller had described a monopoly as "an institution or allowance by the king [the state], by

his grant, commission, or otherwise, to any person or persons, bodies politique or corporate, of or

for the sole buying, selling, making, working, or using of anything, whereby any person or persons,

bodies politique or corporate, are sought to be restrained of any freedome or liberty that they had

before, or hindered in their lawful trade." *Wright*, 88 Md. 436, 41 A. at 798 (alteration in *Wright*).

Embracing this definition, the court found that "[t]o constitute a monopoly within the meaning of

this definition, there must be an allowance or grant by the state to one or several of a sole right;

that is, a right to the exclusion of all others than the grantee or grantees." *Id.* at 41 A. at 798.  The

court rejected Wright's argument, reasoning that the statute was "a grant to none," but rather "a

prohibition to all," because it banned anyone from manufacturing or selling oleomargarine.  *Id.*

Next, the Maryland Court of Appeals expounded on Article 41 in *Raney v. Montgomery

County Commissioners*, 170 Md. 183, 183 A. 548 (1936).  That case involved a challenge to a

local ordinance that required "'[e]very notice, report, return, schedule, list of delinquent taxpayers

or any official publication whatsoever'" to be published in a newspaper that was printed in the

county.  *Id.* at 183 A. 550.  The term "monopoly," the court explained, "ordinarily connotes a

privilege connected with commerce in commodities because, historically, it was more often used

to describe a condition which resulted from an exclusive privilege to engage in such commerce[.]"

*Id. at* 183 A. at 551.  However, the court observed that the term "has long had a broader meaning

more in harmony with the spirit of the Constitution, and in determining the sense in which it is

used in that instrument, it should be given that meaning that its general intent may be served, rather

than thwarted or confined by any narrow or overnice construction."  *Id.*

Under this broader meaning, the court explained that "when the creation or grant of such a privilege is needed to aid some governmental function or purpose essential to the protection of the public security, health, or morals, it may not be obnoxious to the constitutional condemnation of monopolies." *Id.* at 183 A. at 553. Conversely, "when the public derives no benefits from the privilege, or it is in respect to a common calling, or a matter of common right, and is not necessary to the protection of the public health, morals, or safety, an exclusive privilege to deal in a commodity, to operate a business, to traffic or to engage in any activity for gain, or to sell a given service, may constitute a monopoly within the meaning of that provision." *Id.* Turning to the facts of the case at hand, the court had no trouble concluding that because the ordinance's purpose was to grant a monopoly to the county's newspapers, it ran afoul of Article 41. *Id.*

Then, in 1946, the Maryland Court of Appeals was asked to decide whether the Sinai Hospital of Baltimore, which received state funding, violated Article 41 by denying hospital privileges to a physician. *See Levin v. Sinai Hosp. of Balt. City*, 186 Md. 174, 46 A.2d 298 (1946). The court stated, *id.* at 182-83, 46 A.2d at 302:

> A monopoly within the prohibition of our Declaration of Rights, is a privilege or power to command and control traffic in some commodity, or the operation of a trade or business to the exclusion of others, who otherwise would be at liberty to engage therein, necessarily implying the suppression of competition, and ordinarily causing a restraint of that freedom to engage in trade or commerce which the citizen enjoys by common right. A monopoly is more than a mere privilege to carry on a trade or business or to deal in a specified commodity. It is an exclusive privilege which prevents others from engaging therein. A grant of privileges, even though monopolistic in character, does not constitute a monopoly in the constitutional sense when reasonably required for protection of some public interest, or when given in return for some public service, or when given in reference to some matter not of common right.

Based on this definition, the court found it "obvious" that the hospital's admitting privileges did not violate Article 41 because they "do not restrain interstate trade or commerce"

and their "purpose was not to destroy competition or to restrain the free availability of hospital or medical services to the public." *Id.* at 183, 46 A.2d at 303.

It appears that the Maryland Court of Appeals last addressed the meaning of Article 41 in 1973, in the case of *Supermarkets General Corporation v. State*, 286 Md. 611, 409 A.2d 250 (1979), which involved a challenge to Sunday closing laws. The court reaffirmed the *Levin* Court's definition of "monopoly." *Id.* at 626, 46 A.2d at 258. And, it rejected the plaintiffs' contention that the law violated Article 41 because it gave larger establishments an advantage over small ones, finding that the laws "simply provides, uniformly, conditions under which [stores] may operate." *Id.* at 627, 46 A.2d at 258. Thus, the laws did not violate Article 41 because they "are not and do not result in a grant to one to the exclusion of others[.]" *Id.* at 627, 46 A.2d at 259.

Several principles emerge from these decisions. First, Article 41 does not preclude a State or locality from prohibiting an activity in toto. *See, e.g.*, *Supermarkets Gen.*, 286 Md. 611, 409 A.2d 250; *Wright*, 88 Md. 436, 41 A. 795. Second a monopoly for the purpose of Article 41 is an "exclusive privilege." *Levin*, 186 Md. at 182-83, 46 A.2d at 302; *Raney*, 170 Md. 183, 183 A. 552. And, an exclusive privilege is "an allowance or grant by the state to one or several of a sole right; that is, a right to the exclusion of all others than the grantee or grantees." *Wright*, 88 Md. 436, 41 A. at 798. Third, an exclusive privilege "does not constitute a monopoly in the constitutional sense when reasonably required for protection of some public interest, or when given in return for some public service, or when given in reference to some matter not of common right." *Levin*, 186 Md. at 182-83, 46 A.2d at 302.

Applying these principles to the case *sub judice*, plaintiffs have not pleaded a plausible claim under Article 41. The Puppy-Mill Act does not constitute an exclusive right to sell cats and dog in Maryland. Although the Act prohibits brick-and-mortar stores from participating in the sale

of cats and dogs, consumers still have a plethora of choices when seeking to obtain a pet, including rescue shelters, animal control units, USDA licensed breeders and brokers, and unregulated hobby breeders. Further, the Puppy-Mill Act is not a monopoly "in the constitutional sense" because its purpose is "not to destroy competition or restrain the free availability of [pets] to the public." *Levin*, 186 Md. at 183, 46 A.2d at 303. Rather, as explained, *supra*, the Act's legislative history demonstrates that Maryland's ban on the sale of cats and dogs in retail stores is intended to further the public's interest in preventing animal cruelty, increasing adoptions, and protecting consumers.

Thus, I shall dismiss Count VI.

## V.     The P.I. Motion

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Benisek v. Lamone*, ___ U.S. ___, 138 S. Ct. 1942, 1943 (2018); *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020); *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc). Rather, a preliminary injunction is "'granted only sparingly and in limited circumstances.'" *MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (citation omitted).

To qualify for a preliminary injunction, the plaintiff "must establish that he is likely to succeed on the merits[.]" *Winter*, 555 U.S. at 20. Although that standard does not require "a 'certainty of success,'" the plaintiff "must make a clear showing that he is likely to succeed at trial.'" *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citation omitted). However, "a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek*, 138 S. Ct. at 1943-44 (citing *Winter*, 555 U.S. at 32). "Rather, a court must also consider whether the movant has shown 'that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor,

and that an injunction is in the public interest.'" *Benisek*, 138 S. Ct. at 1943-44 (quoting *Winter*, 555 U.S. at 20); *see also Centro Tepeyac*, 722 F.3d at 188 (applying the standard for preliminary injunctions set forth in *Winter*). A preliminary injunction cannot issue unless all four factors are satisfied. *See Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013).

Because plaintiffs have not stated plausible claims, they have failed to establish that they are likely to succeed on the merits, the first *Winter* element. Accordingly, plaintiffs do not qualify for the "extraordinary relief" of a preliminary injunction. *Winter*, 555 U.S. at 24.

## VI.    Conclusion

For the foregoing reasons, I shall grant the Motion (ECF 5). And, I shall deny the P.I. Motion (ECF 20).

An Order follows consistent with this Memorandum Opinion.


Date: February 7, 2020


_____/s/_____
Ellen Lipton Hollander
 United States District Judge