IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JUST PUPPIES, INC., et al.,
*Plaintiffs*,

   v.

BRIAN E. FROSH, *et al.*,
*Defendants*.

Civil Action No. ELH-19-2439

**MEMORANDUM OPINION**

This case involves a constitutional challenge to Maryland's "No More Puppy-Mill Pups Act" (the "Act" or "Puppy-Mill Act"), codified at Md. Code (2015 Repl. Vol., 2019 Supp.), § 19-703 of the Business Regulation Article ("Bus. Reg."). The Act, which went into effect on January 1, 2020, bans retail pet stores located in Maryland from "offer[ing] for sale or otherwise transfer[ing] or dispos[ing] of cats or dogs." Suit was filed on August 23, 2019, by four pet stores, a dog breeder, and a dog broker. ECF 1 (the "Complaint").

The plaintiff pet stores are Just Puppies, Inc., d/b/a Just Puppies Towson; Just Puppies of Maryland, Inc., d/b/a Just Puppies Rockville (collectively, "Just Puppies"); Charm City Puppies, LLC, d/b/a Charm City Puppies & Boutique ("Charm City Puppies"); and Today's Pet, Inc., d/b/a Today's Pet. Plaintiff Jodie Hancock, d/b/a 2 Mile Kennel, is a dog breeder located in Missouri. Plaintiff Sobrad, LLC, d/b/a Pinnacle Pet, is a Missouri-based broker of dogs. They sued defendants Brian E. Frosh, in his capacity as the Attorney General of Maryland; the Consumer Protection Division of the Office of the Maryland Attorney General ("CPD"); and two committees of the Maryland General Assembly: the Maryland State Senate Finance Committee and the Maryland House Economic Matters Committee.

Plaintiffs sought, *inter alia*, an injunction prohibiting enforcement of the Act as well as a declaration that the Act is invalid.  ECF 1.  In response, defendants moved to dismiss based on sovereign immunity and for failure to state a claim.  I granted the defendants' motion in a Memorandum Opinion (ECF 49) and Order (ECF 50) of February 7, 2020.  *See also* ECF 52.[1]

On March 6, 2020, plaintiffs moved for leave to file an amended complaint against Mr. Frosh.  ECF 53.[2] The motion, filed under rules 15(a), 59(e), and 60(b) of the Federal Rules of Civil Procedure, is supported by a memorandum (ECF 53-1) (collectively, the "Motion" or "Motion to Amend") and sixteen exhibits.  ECF 53-2 to ECF 53-4; ECF 54-1 to ECF 54-12.  A redlined version of the proposed amended complaint is docketed at ECF 53-4 (the "Proposed Amended Complaint").  The State opposes the Motion (ECF 58) and plaintiffs have replied.  ECF 59.

No hearing is necessary to resolve the Motion to Amend.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion.

## I.    Background[3]

As detailed in the Court's prior Memorandum Opinion (ECF 52 at 6-14), Maryland has regulated the sale of dogs and cats by retail pet stores since 2012.  Beginning in 2012, retail pet stores in Maryland were required to maintain written records of the breeders and brokers they

---

[1] Westlaw subsequently designated the opinion for publication.  Thereafter, a revised version of the Memorandum Opinion, containing non-substantive typographical and "Bluebook" corrections, was docketed on February 19, 2020.  ECF 52.  Hereinafter, I shall cite to ECF 52.

[2] As explained in the prior Memorandum Opinion, sovereign immunity bars plaintiffs' suit against the CPD and the Maryland General Assembly.  ECF 52 at 29-35.  However, plaintiffs were entitled to proceed against Mr. Frosh under the *Ex parte Young* exception.  *See id.*  Because Mr. Frosh is sued in his capacity as the Attorney General of Maryland, I shall sometimes refer to defendant as the "State" or "Maryland."

[3] The facts underlying this dispute are set forth in the earlier Memorandum Opinion, and are incorporated here.  *See* ECF 52.  The facts presented below provide context for the Motion to Amend.

utilized; they were required "conspicuously" to post each puppy's breed, age, date of birth, and medical history; and they had to provide purchasers with a health certificate from a licensed veterinarian certifying that the animal was healthy.  *See* Bus. Reg. § 19-703 (repealed eff. Jan. 1, 2020); *see* ECF 52 at 6-7.  Stores that violated these reporting requirements were subject to penalties under Maryland's Consumer Protection Act, Md. Code (2015 Repl. Vol.), § 13-301 *et seq.* of the Commercial Law Article.  *See* Bus. Reg. § 19-706 (repealed eff. Jan 1, 2020).

In 2016, the Maryland General Assembly imposed additional requirements on retail pet stores.  *See* 2016 Md. Laws., Ch. 572; ECF 52 at 7.  The new law limited retail pet stores to the sale of dogs and cats obtained from (1) an animal welfare organization; (2) an animal control unit; (3) the original breeder of the dog or cat if the breeder was licensed by the United States Department of Agriculture ("USDA"); or (4) a dealer who obtained the dog or cat from a USDA licensed breeder.  Bus. Reg. § 19-702.1(a) (repealed eff. Jan 1, 2020).  Further, Maryland prohibited pet stores from doing business with dealers who had received certain citations from the USDA for violations of the Animal Welfare Act of 1966 ("AWA"), 7 U.S.C. § 2131 *et seq.*  *See* Bus. Reg. § 19-702.1(b) (repealed eff. Jan 1, 2020).

Despite these requirements, animal welfare organizations continued to lobby for further action.  On February 9, 2018, Benjamin Kramer, a member of the Maryland House of Delegates, introduced House Bill 1662, the "No More Puppy-Mill Pups Act of 2018."  *See Legislation*: *HB1662*, Maryland General Assembly, *archived at* https://perma.cc/8RYA-D37X (Hereafter, "H.B. 1662 Legislative Record").  On March 12, 2018, The House Economic Matters Committee solicited testimony concerning the Act.  Animal rights activists advocated in favor of the bill, while pet store owners and a lobbyist from the Pet Industry Joint Advisory Council spoke out against it.  *See* ECF 54-2 at 1-28; ECF 52 at 8-11.  H.B. 1662 was referred to the Senate Finance Committee

on March 19, 2018, which held a public hearing on March 29, 2018.  *See* ECF 54-2 at 68-80; ECF 52 at 12.

Ultimately, the Maryland Generally Assembly passed the Act.  Governor Larry Hogan signed H.B. 1662 into law on April 25, 2018. 2018 Md. Laws., Ch. 237; *see* ECF 52 at 12-13.  The Puppy-Mill Act amended Bus. Reg. § 19-701, titled "Definitions." And, it repealed Bus. Reg. § 19-702.1, titled "Requirements for retail pet stores." The Act also substantially amended Bus. Reg. §§ 19-703, 19-704, 19- 705, 19-706, and 19-707.

"Section 1" of the Puppy-Mill Act provides, in relevant part:

(a) *Prohibition*—A retail pet store may not offer for sale or otherwise transfer or dispose of cats or dogs.

(b) *Exception*—This section may not be construed to prohibit a retail pet store from collaborating with an animal welfare organization or animal control unit to offer space for these entities to showcase cats or dogs for adoption.

2018 Md. Laws., Ch. 237, § 1; Md. Code (2015 Repl. Vol., 2019 Supp.), Bus. Reg. § 19-703.

The Puppy-Mill Act also contains two uncodified provisions.  *See* 2018 Md. Laws., Ch. 237, §§ 2-3.  They provide, *id.*:

SECTION 2. AND BE IT FURTHER ENACTED, That it is the intent of the General Assembly that:

(1) animal welfare organizations initiate contact with retail pet stores, as provided under § 19–703(b) of the Business Regulation Article, as enacted by Section 1 of this Act, that will no longer be able to offer for sale cats and dogs, to facilitate collaboration to showcase cats and dogs for:

(i) adoption from an animal control unit or an animal welfare organization; or

(ii) purchase from local breeders; and

(2) the Senate Finance Committee and the House Economic Matters Committee monitor the implementation of this Act.

SECTION 3. AND BE IT FURTHER ENACTED, That Section 1 of this Act shall take effect January 1, 2020.

4

The Act defines "offer for sale" in Bus. Reg. § 19-701(f), as follows: "'Offer for sale' includes to sell, offer to transfer, offer for adoption, advertise for the sale, barter, auction, give away, or otherwise dispose of a domestic animal."  The Act, however, does not define the terms "showcase" or "local breeders."

As with the prior State laws, under Bus. Reg. § 19-704(a)(1), a violation of the Puppy-Mill Act constitutes an unfair or deceptive trade practice within the meaning of Title 13 of the Commercial Law Article of the Maryland Code.   Stores in violation of the Act are subject to fines and civil penalties.  Bus. Reg. § 19-704(a)(2).

Plaintiffs Just Puppies, Charm City Puppies, and Today's Pets are pet stores with locations in Maryland.  ECF 52 at 13-14.  The pet stores maintain that they source pets only from reputable, USDA licensed breeders and brokers.  *Id.* at 14.  And, they allege that they studiously complied with Maryland law as it existed prior to the Puppy-Mill Act.  *Id*.  According to the pet stores, a significant portion of their gross sales derived from the sale of cats and dogs. *Id.* at 13.  As a result, each store asserts that it will be forced to shutter if the Puppy-Mill Act goes into effect.  *Id.*

Ms. Hancock, a breeder of purebred and designer dogs, is located in Missouri.  She has supplied dogs to Just Puppies for over fifteen years.  *Id.* at 14.  She is licensed by both the USDA and the State of Missouri, and she alleges that she has never been cited by either.  *Id.* Ms. Hancock does not maintain a website, nor does she sell directly to the public.  *Id.*

Pinnacle Pet, also located in Missouri, purchases purebred and designer dogs and resells them to pet stores, including Charm City Puppies. *Id.* at 15.  Like Ms. Hancock, Pinnacle Pet alleges that it has never been found in violation of federal or state regulations.  *Id*.  Although Pinnacle Pet maintains a website, it sells only to retail pet stores.  *Id.*  Pinnacle Pet claims that

Maryland pet stores constitute a significant portion of its sales in its Maryland-Pennsylvania sales region and that the loss of this business would force it to terminate several employees. *Id.*

The State moved to dismiss the Complaint on September 17, 2019. ECF 5 (the "Motion to Dismiss"). About five weeks later, on October 23, 2019, plaintiffs filed a motion for preliminary injunction, seeking to stay the enforcement of the then impending Puppy-Mill Act. ECF 20 (the "P.I. Motion").

In late January 2020, the Court held an evidentiary hearing on the P.I. Motion. Over the course of two days, plaintiffs introduced 42 exhibits, including, *inter alia*, the Act's legislative history, financial records of the pet store plaintiffs, licenses and inspection reports for Ms. Hancock and Pinnacle Pet, consumer complaints filed with the CPD, and several news articles. ECF 43 (Plaintiffs' Exhibit List). In addition, the Court received testimony from five witnesses, including Ms. Hancock; Becky Schmidt, the manager of Charm City Puppies; Christopher Fleming, the Chief Executive Officer of Pinnacle Pet; and Michael Bober, a lobbyist with the Pet Industry Joint Advisory Council. *See* ECF 56 (1/29/2020 Transcript); ECF 57 (1/30/2020 Transcript). In addition, plaintiffs presented the testimony of other witnesses by way of proffers.

On February 7, 2020, the Court granted the Motion to Dismiss and denied the P.I. Motion. ECF 49; ECF 50; *see* ECF 52. As an initial matter, I found that the Eleventh Amendment compels the dismissal of the CPD and the Maryland General Assembly. ECF 52 at 29-35. However, I rejected defendants' contention that sovereign immunity barred the suit altogether, observing that Mr. Frosh was a proper defendant under the *Ex parte Young* exception to the Eleventh Amendment. *See id.* I then turned to evaluate whether the Complaint stated plausible claims for relief.

In Count I, which is founded on the dormant Commerce Clause, plaintiffs alleged that the Puppy-Mill Act is per se invalid because it discriminates against out-of-state dog breeders and

brokers in its text, purpose, and effect. *Id.* at 41. I determined that the Act is not facially discriminatory because it does not distinguish between in-state and out-of-state breeders and brokers. *Id.* at 46. I explained, *id.* at 45-46:

> Pursuant to § 19-703(a)'s unequivocal language, a Maryland pet store cannot offer "to sell, offer to transfer, offer for adoption, advertise for the sale, barter, auction, give away, or otherwise dispose of" a cat or dog. That prohibition applies equally to animals bred in Maryland or Missouri. Therefore, breeders and brokers are equally burdened, regardless of whether they are located in Maryland or outside of the State. Conversely, because § 19-703(a) does not cover showcasing, pet stores may showcase cats and dogs from any source. And, although Section 2 expresses the General Assembly's preference that pet stores showcase dogs from local breeders, it cannot be read to impinge on the ability of pet stores to showcase animals from out-of-state breeders.

Likewise, I concluded that the Act does not discriminate in its effect against out-of-state breeders and brokers. ECF 52 at 48. I reasoned that the Puppy-Mill Act does not impinge on the flow of interstate goods because it "does not prevent breeders and brokers located outside of Maryland from selling cats and dogs to Maryland consumers." *Id.* at 49. Rather, breeders and brokers "have many options for reaching the Maryland pet market, including selling their inventory directly to Maryland residents through the internet, print advertising, or by showcasing animals in pet stores." *Id.* Although plaintiffs do not sell directly to consumers, I concluded that this was "of no constitutional import" because "the Commerce Clause does not protect 'particular structure or methods of operation in a retail market.'" *Id.* (quoting *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127 (1978)).

Finally, I found lacking plaintiffs' allegations that the Act was intended to disadvantage out-of-state breeders and brokers. ECF 52 at 49-50. It is doubtful that "discriminatory purpose alone suffices to invalidate a statute," I surmised, and, regardless, plaintiffs' claim that the Puppy-Mill Act was driven by economic protectionism was belied by the legislative record. *Id.* at 50. Consequently, I dismissed Count I.

Tacking in a different direction, plaintiffs claimed in Count II that the Puppy Mill Act discriminates in its text, effect, and purpose against in-state pet stores "'based on the origin of their product'" because the Act "'only prohibits pet stores from selling out-of-state pets.'"  ECF 52 at 50 (quoting ECF 1, ¶ 106, then ¶ 104).  Here too, I concluded that plaintiffs' textual theory was "premised on a flawed reading of Section 2" of the Act.  *Id.* at 51.  I reiterated that Section 2 of the Puppy-Mill Act does not create an exception to § 19-703(a), but instead "merely expresses the legislature's desire to encourage pet stores to showcase animals from local breeders."  *Id.*  Because the Act flatly prohibits the sale of cats and dogs by retail pet stores, it "does not distinguish on its face or in effect between animals that originate in state or out-of-state."  *Id.*  Plaintiffs' purpose theory was similarly implausible because Maryland residents were in no way inhibited from acquiring out-of-state dogs or cats.  *Id.*   Accordingly, I concluded that Count II was subject to dismissal.

Count III alleged that the Puppy-Mill Act violates the Commerce Clause under the balancing test set forth in *Pike v. Bruce Church, Inc*., 397 U.S. 137 (1970).  Acknowledging that *Pike* balancing demands a fact-sensitive inquiry, I nonetheless determined that plaintiffs failed plausibly to allege that the burdens imposed on interstate commerce by the Act demonstrably outweighed the Act's putative benefits.  ECF 52 at 52-54.

On the one hand, plaintiffs conceded in their Complaint that the Act advanced numerous purported interests, including "'to eradicate so-called puppy mills'"; 'reduce the number of animals in shelters'; and 'protect[] consumers from purchasing unhealthy animals.'"  *Id.* at 53 (quoting ECF 1, ¶ 119).  On the other, the Act allegedly burdened "'out-of-state regulated breeders and brokers who will be prohibited from selling to any retail pet stores in Maryland,'" and "'pet stores, which will have to completely change their business model of selling pets if they wish to

stay in business[.]'"  *Id.* (quoting ECF 1, ¶ 113, then ¶ 114).  But, these alleged harms are not

burdens for the purposes of *Pike* balancing because "the Commerce Clause does not serve as a

safety-net for individual firms nor protect a firm's preferred business methods."  *Id.* at 53.  As a

result, I concluded that plaintiffs failed to state an undue-burden claim.  Therefore, I dismissed

Count III.

Next, I assessed the viability of Count IV, which alleged that the Puppy-Mill Act is

preempted by the AWA because it obstructs the AWA's licensing scheme for breeders and brokers.

*Id.* at 54.  I rejected this claim as implausible, concluding that "the Act in no way stands as an

obstacle to the AWA's system of licensing and inspection."  *Id.* at 60.  As I explained, *id.* at 59-

60:

> Prohibiting Maryland pet stores from selling dogs or cats has no effect on
> the operation of the AWA. The Puppy-Mill Act's impact on pet stores does not
> clash with the AWA, because pet stores are explicitly exempt from the AWA. *See*
> 7 U.S.C. § 2132(f). On the other hand, breeders and brokers who sell to Maryland
> consumers and who fall within the AWA's sweep "will still have to get licenses,
> will still have to provide information to federal officials, and will still have to open
> their facilities to federal inspection." *N.Y. Pet Welfare*, 850 F.3d at 88.

Additionally, I observed that the AWA expressly contemplates state and local regulation

of animal sales, which cuts against preemption.  ECF 52 at 60.  And, I noted that courts have

repeatedly rejected preemption claims predicated on the AWA.  *Id.* at 61 (collecting cases).

Having concluded that the Complaint did not state a colorable preemption claim, I

proceeded to examine Count V, which alleged an equal protection claim.  The Court first analyzed

the applicable level of scrutiny.  *See id.* at 65-69.  Plaintiffs asserted that the Puppy-Mill Act is

subject to heightened rational basis review; defendants countered that ordinary rational basis

applies.  After canvassing the Supreme Court's animus jurisprudence, I stated, *id.* 68-69:

Applying these principles here, plaintiffs' equal protection claim is subject to traditional principles of rational basis review. This case shares little in common with *Moreno*, *Cleburne*, *Romer*, or *Windsor*. The Act does not implicate an immutable characteristic, such as mental disability or sexual orientation. *See* Raphael Holoszyc-Pimentel, Note, *Reconciling Rational-Basis Review: When Does Rational Basis Bite?*, 90 N.Y.U. L. REV. 2070, 2085-89 (2015) (finding that heightened rational basis is generally limited to cases involving immutable traits). The Act's effect—banning a particular class of vendors from selling certain products—is not "unprecedented in our jurisprudence." *Romer*, 517 U.S. at 633; *see, e.g.*, *Chinatown Neighborhood Ass'n, v. Harris*, 794 F.3d 1136 (9th Cir. 2015) (banning the sale of shark fins); *Assoc. de Eleveurs*, 729 F.3d at 952 (banning the sale of foie gras); *Empacadora de Carnes de Fresnillo*, 476 F.3d at 336 (banning the sale of horsemeat). It does not have the "peculiar property" of stripping a particular group of special privileges or protections afforded to others. *Romer*, 517 U.S. at 632. Whereas DOMA intruded on the states' traditional police power to regulate domestic regulations, the Puppy-Mill Act is an exercise of Maryland's core police powers. *See Windsor*, 570 U.S. at 768- 72. And, as discussed, *infra*, it simply cannot be said that the Act is "inexplicable by anything but animus," *Romer*, 517 U.S. at 632, because the State has advanced numerous legitimate interests to justify the Act.

Further, I explained that plaintiffs' reliance on statements by Delegate Kramer labeling puppy mills as "horror shows," a "disgusting trade," and an "abomination" was misguided. ECF 52 at 69. I reasoned that those "statements were directed at certain kinds of breeders, not Maryland pet stores" and, "notwithstanding Delegate Kramer's strong language, numerous courts have recognized that addressing irresponsible animal breeding is a legitimate state interest." *Id.*

Left only with rational basis review, I found that Count V "failed to plead a plausible equal protection violation." *Id.* at 70. For starters, plaintiffs did not identify a comparator group, instead alleging in a conclusory fashion that the Act "'treats Plaintiffs differently than others similarly situated[.]'" *Id.* (quoting ECF 1, ¶ 132). Moreover, plaintiffs failed to dispel the presumption of rationality because "the record contains ample facts that provide a rational basis for the Puppy-Mill Act," such as "[p]rotecting consumers, reducing financial support for mill breeders, and encouraging pet adoption are indisputably legitimate state interests." ECF 52 at 71. The General Assembly could rationally conclude that banning the sale of cats and dogs in stores would advance

those interests, I explained, by "mak[ing] it more difficult for irresponsible breeding operations to evade scrutiny," "nudg[ing] consumers towards shelters," and "remov[ing] Maryland pet stores as a source of income for puppy-mills."  ECF 52 at 72.

To be sure, I observed that the legislation is a "poorly drafted statute," *id.* at 42, and it might create as many problems for consumers as it sought to solve.  *Id.* at 73.  But, I underscored that rational basis review does not permit a court to require the government to furnish empirical data to defend its legislation or to probe a law's efficacy.  *Id.*

Finally, I considered plaintiffs' claim that the Act violates Article 41 of the Maryland Declaration of Rights, which provides that "monopolies are odious, contrary to the spirit of a free government and the principles of commerce, and ought not to be suffered."  A survey of the handful of Maryland appellate decisions addressing Article 41 yielded several guiding principles, *id.* at 77:

> First, Article 41 does not preclude a State or locality from prohibiting an activity in toto. *See, e.g.*, *Supermarkets Gen.*, 286 Md. 611, 409 A.2d 250; Wright, 88 Md. 436, 41 A. 795. Second a monopoly for the purpose of Article 41 is an "exclusive privilege." *Levin*, 186 Md. at 182-83, 46 A.2d at 302; *Raney*, 170 Md. 183, 183 A. 552. And, an exclusive privilege is "an allowance or grant by the state to one or several of a sole right; that is, a right to the exclusion of all others than the grantee or grantees." *Wright*, 88 Md. 436, 41 A. at 798. Third, an exclusive privilege "does not constitute a monopoly in the constitutional sense when reasonably required for protection of some public interest, or when given in return for some public service, or when given in reference to some matter not of common right." *Levin*, 186 Md. at 182-83, 46 A.2d at 302.

Against that backdrop, I determined that plaintiffs had not pleaded a plausible claim under Article 41.  ECF 52 at 77.  First, the Puppy-Mill Act "does not constitute an exclusive right to sell cats and dog in Maryland" because "consumers still have a plethora of choices when seeking to obtain a pet, including rescue shelters, animal control units, USDA licensed breeders and brokers, and unregulated hobby breeders."  *Id.* at 77-78.  Second, the Act "is not a monopoly 'in the

constitutional sense' because its purpose is 'not to destroy competition or restrain the free availability of [pets] to the public'" but rather "to further the public's interest in preventing animal cruelty, increasing adoptions, and protecting consumers." *Id.* at 78 (alteration in ECF 52) (quoting *Levin v. Sinai Hosp. of Balt. City*, 186 Md. 174, 183, 46 A.2d 298, 303 (1946)).

Given the paucity of plausible claims, I granted defendants' Motion to Dismiss (ECF 5) and dismissed the Complaint in its entirety. *See* ECF 52 at 79; ECF 50. And, because plaintiffs could not establish a likelihood of success on the merits, a prerequisite for the extraordinary relief of a preliminary injunction, I denied plaintiffs' P.I. Motion (ECF 20). *See* ECF 52 at 79; ECF 50.

The Motion to Amend followed on March 6, 2020. ECF 53.

## II.    Standard of Review

Rule 15 of the Federal Rules of Civil Procedure governs amendments to pleadings. It provides that a party "may amend its pleading once as a matter of course" before the opposing party files a responsive pleading. Fed. R. Civ. P. 15(a)(1). Thereafter, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). However, Rule 15 provides that leave to amend should be "freely give[n] . . . when justice so requires." *Id.*; *see Foman v. Davis*, 371 U.S. 178, 182 (1962); *Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 914 F.3d 213, 227-28 (4th Cir. 2019); *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 409 (4th Cir. 2013). This injunction "gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." *Matrix Capital Mgmt. Fund LP v. Bearing Point, Inc.*, 576 F.3d 172, 193 (4th Cir. 2009).

A motion to amend filed after a judgment of dismissal cannot be resolved unless the court first vacates the judgment, pursuant to Rule 59 or 60 of the Federal Rules of Civil Procedure. *See ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 776 (4th Cir. 2019); *Calvary Christian Ctr.*

*v. City of Fredericksburg*, 710 F.3d 536, 539 (4th Cir. 2013) (collecting cases); *Laber v. Harvey*, 438 F.3d 404, 426-29 (4th Cir. 2006) (en banc). The Fourth Circuit has instructed that in assessing if vacatur is warranted, the court "need not concern itself with either of those rules' legal standards." *Katyle v. Penn Nat'l Gaming, Inc*., 637 F.3d 462, 471 (4th Cir. 2011). Rather, the "court need only ask whether the amendment should be granted, just as it would on a prejudgment motion to amend pursuant to Fed. R. Civ. P. 15(a)." *Id*.; *see also ChargePoint, Inc*., 920 F.3d at 539 n.6. That is, a "'court should evaluate a postjudgment motion to amend the complaint under the same legal standard as a similar motion filed before judgment was entered.'" *Adbul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278, 293 (4th Cir. 2018) (quoting *Katyle*, 637 F.3d at 471); *see Laber*, 438 F.3d at 429.

Nevertheless, a court should deny leave to amend in three circumstances: "'when the amendment would be prejudicial to the opposing party, the moving party has acted in bad faith, or the amendment would be futile.'" *Davison v. Randall*, 912 F.3d 666, 690 (4th Cir. 2019) (quoting *Equal Rights Ctr. v. Niles Bolton Assocs*., 602 F.3d 597, 603 (4th Cir. 2010)); *see Scott v. Family Dollar Stores, Inc*., 733 F.3d 105, 121 (4th Cir. 2013); *Johnson v. Oroweat Foods Co*., 785 F.2d 503, 509 (4th Cir. 1986). Here, the State does not contend that amendment would be prejudicial, nor does it impugn plaintiffs' motives. Instead, Maryland opposes the Motion solely on futility grounds. *See* ECF 58 at 5-10.

Leave to amend should be denied when the proposed amendment would be futile. *See Foman*, 371 U.S. at 182; *see also Save Our Sound OBX*, 914 F.3d at 228; *Laber*, 438 F.3d at 426. "A proposed amendment is futile when it is 'clearly insufficient or frivolous on its face.'" *Save Our Sound OBX*, 914 F.3d at 228 (quoting *Johnson*, 785 F.2d at 510). A proposed amendment is also futile if the complaint, as amended, fails to state a claim upon which relief could be granted.

*Save Our Sound OBX*, 914 F.3d at 228.  Thus, a court may disallow amendment where "the new claim would not have survived a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Davison*, 912 F.3d at 690; *see also Martin v. Duffy*, 858 F.3d 239, 247-48 (4th Cir. 2017) (affirming denial of leave to amend on futility grounds where the plaintiff's "pleading deficiency cannot be cured by amendment of his complaint"), *cert. denied*, ___ U.S. ___ 138 S. Ct. 738 (2018); *U.S. Airline Pilots Ass'n v. Awappa, LLC*, 615 F. 3d 312, 320 (4th Cir. 2010) (stating that a court need not grant leave to amend where the amendment would have "no impact on the outcome of the motion to dismiss").

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 687-80 (2009) (expounding on the Rule 12(b)(6) standard); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  To be sure, a plaintiff need not include "detailed factual allegations" to withstand a motion to dismiss.  *Twombly*, 550 U.S. at 555.  But, it is axiomatic that "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient.  *Id.* at 570; *see Iqbal*, 556 U.S. at 678  (explaining that "an unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim for relief).  In short, to survive Rule 12(b)(6), the "'plaintiffs' factual allegations must be enough to raise a right to relief above the speculative level, thereby nudging their claims across the line from conceivable to plausible.'"  *Hately v. Watts*, 917 F.3d 770, 781 (4th Cir. 2019) (citation omitted).

Notably, a district court has "broad discretion to deny leave to amend, 'so long as it does not outright refuse to grant the leave without any justifying reason.'"  *Edwards v. Genex Coop., Inc.*, 777 F. App'x 613, 622 (4th Cir. 2019) (quoting *Equal Rights Ctr.*, 602 F.3d at 603).  A court

abuses its discretion to grant or deny leave to amend "'by resting its decision on a clearly erroneous finding of a material fact, or by misapprehending the law with respect to underlying issues in litigation.'" *Edwards*, 777 F. App'x at 622 (quoting *Scott*, 733 F.3d at 112).

### III.   Discussion

In the Motion to Amend, plaintiffs seek to revive each of the claims dismissed by the Court in its Memorandum Opinion and Order of February 7, 2020.  Plaintiffs aver that its Motion is not filed in bad faith and that amendment would not prejudice the State because the case is in its infancy and discovery is yet to commence.  ECF 53-1 at 4-7.  Nor is amendment futile, plaintiffs contend, because the Proposed Amended Complaint cures the deficiencies that the Court identified in the original Complaint and thus can withstand a challenge under Rule 12(b)(6).  *Id.* at 7-11. According to plaintiffs, the "proposed amendments do not add additional claims or legal theories, but rather, merely add specificity to the allegations and address the Court's interpretation of the Act, which is different than Plaintiffs' interpretation upon which the original complaint was filed." *Id.* at 5.

As noted, the State opposes the Motion to Amend on the basis of futility.  *See* ECF 58 at 5.  In the State's view, the Motion "is nothing more than an attempt at another bite at the apple through the simple repackaging of the same arguments that were made at that hearing and that were rejected in this Court's thorough analysis of those arguments."  *Id.* at 6.

Given that the parties joust only over the futility of plaintiffs' proposed allegations, I examine the claims lodged in the Proposed Amended Complaint.  Because I conclude that each claim is plagued by incurable deficiencies, I shall deny plaintiffs' request for leave to amend.

## A. Commerce Clause

As in the original Complaint, Counts I, II, and III of the Proposed Amended Complaint allege that the Puppy-Mill Act violates the dormant the Commerce Clause.  *See* ECF 53-4, ¶¶ 114-62.  Plaintiffs concede that the Act is not facially discriminatory, but they aver that it "nonetheless discriminates in its effect and purpose, and places unreasonable burdens on commerce, which calls for an analysis under the *Pike* balancing test."  ECF 53-1 at 9.

I address the viability of each claim, in turn.

### 1.  Discrimination Against Out-Of-State Breeders and Brokers

In Count I, plaintiffs allege that the Puppy-Mill Act discriminates in its purpose and effect against USDA licensed out-of-state breeders and brokers.  ECF 53-4, ¶ 121.  Plaintiffs' central contention is that USDA regulations require USDA licensed breeders and brokers to "keep their animals in a USDA inspected and approved facility until the animal is sold, transferred, or adopted."  *Id.* ¶ 122.  Consequently, "USDA licensed breeders and brokers cannot showcase their puppies in retail pet stores in Maryland because the stores are not approved and inspected by the USDA to hold the dogs until sale."  *Id.*  According to plaintiffs, "without the ability to sell through retail pet stores," breeders and brokers will be unable to do business in Maryland because other methods of reaching Maryland consumers are "too burdensome and expensive."  *Id.* ¶ 125.

For instance, plaintiffs claim that selling directly to consumers would require purchasing "new expensive smaller transport vehicles" and would add "as much as $2,00.00 per sale of a puppy to a Maryland consumer." *Id.*; *see id.* ¶ 124.  In contrast, the Act does not hinder "Maryland local hobby breeders," plaintiffs claim, because they can showcase "without restrictions since they are not licensed by the USDA, and further, the cost of delivery and/or pick-up is minimal for Maryland consumers and Maryland local breeders."  *Id.*  Thus, plaintiffs postulate that the Act's

design is to burden out-of-state breeders and brokers in order to benefit "in-state Maryland local hobby breeders." *Id.*

The State questions the plausibility of plaintiffs' contention that out-of-state breeders and brokers cannot showcase in Maryland pet stores without flouting the AWA.  ECF 58 at 7.  It points out that the AWA expressly excludes pet stores from regulation.  *See id.*; *see* 7 U.S.C. §§ 2132(f), 2132(h) (clarifying that pet stores are neither a "dealer" nor "exhibitor" so long as the store does not resell animals to dealers, exhibitors, or research facilities).  From this, the State draws the inference that a breeder or broker can showcase in a Maryland pet store without fear of the AWA. *See* ECF 58 at 7-8.

Plaintiffs counter that USDA regulations require licensed breeders and brokers to disclose all facilities where they house their animals and make such facilities available for inspection.  *See* ECF 59 at 3 (discussing 9 C.F.R. § 2.3(a)).  Thus, plaintiffs posit that USDA licensed breeders and brokers must indicate on their annual USDA license application each Maryland pet store where they intend to showcase, which they insist is "not feasible" because breeders and brokers "cannot ensure the pet stores maintain AWA standards" and "[a]ny USDA violations of the Maryland pet stores would affect the licensure of the breeder or broker."  ECF 59 at 4.

Plowing through a thicket of USDA regulations is unnecessary because, even embracing plaintiffs' position, Count I nonetheless fails to state a plausible dormant Commerce Clause claim. For one thing, to the extent that the AWA creates logistical barriers to showcasing, those difficulties will be felt equally by USDA breeders and brokers, whether they are located inside or outside of Maryland.  In contrast, any breeder who has less than four breeding females and is thus exempt from the AWA, see 9 C.F.R. § 2.1(a)(3)(iii), faces no obstacles to showcasing.  It follows that the Puppy-Mill Act is not discriminatory because, to the extent that it burdens USDA licensed

breeders, those breeders are equally saddled, regardless of the state from which the breeder hails. *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 87 (1987) (explaining that a state law is not discriminatory if it "'visits its effects equally upon both interstate and local business'") (citation omitted).

More fundamentally, plaintiffs' allegations fail because showcasing is merely a business method. And, as I discussed at length in my prior Memorandum Opinion (ECF 52 at 46-48), the Commerce Clause does not protect "the particular structure or methods of operation in a retail market." *Exxon Corp. v. Governor of Md.*, 437 U.S. 117 (1978)); *compare Brown v. Hovatter*, 561 F.3d 357, 364-65 (4th Cir. 2009) (rejecting challenge where the plaintiffs' "complaints about the regulation center around either the inconveniences presented to them personally or the restrictions on how they would prefer to run their businesses"); *with Assoc. for Accessible Meds. v. Frosh*, 887 F.3d 664, 673-74 (4th Cir. 2018) (finding dormant Commerce Clause violation where the state law "requires manufacturers and wholesale distributors to do more than alter their distribution channels"; it "sets prescription drug prices . . . superseding market forces that dictate the price of a good"). For the same reason, plaintiffs' allegations concerning the expense and logistical headaches of transporting dogs directly to consumers are of no moment. *See, e.g.*, *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1092 (9th Cir. 2013) (observing that "the dormant Commerce Clause does not guarantee that [the plaintiffs] may compete on the terms they find most convenient").

Plaintiffs' allegations that the Act is motivated by a discriminatory purpose are similarly implausible. Plaintiffs allege that the Act's "plain language" reveals "clear legislative intent to facilitate the sales of dogs from local Maryland breeders to the detriment of out-of-state USDA licensed breeders and brokers . . . ." ECF 53-4, ¶ 120. Further, plaintiffs include in their Proposed

Amended Complaint statements by Delegate Kramer that Maryland residents should adopt "'or if they want to get a breed-specific dog, [they should] do so from a local breeder that actually cares about their breeding dogs and will meet you, get to know who you are, [and] you get to know who they are . . . .'" *Id.* ¶ 57 (quoting ECF 54-2, at 120, Tr. 9).[4]

Putting aside whether a sinister purpose alone suffices to violate the dormant Commerce Clause (ECF 52 at 49), these allegations do not disturb my prior conclusion that the legislative record makes manifest that "the avowed purpose of the Act is to combat puppy mills," not benefit in-state interests. *Id.* Indeed, as discussed below, the Act is intended to serve concerns that the Maryland General Assembly regarded as in the public interest: curbing support for substandard breeders, improving animal welfare, fostering adoption, protecting consumers, and reducing euthanasia rates. Read in context, Delegate Kramer's statements reflect a desire to promote the humane treatment of animals by removing pet stores from the puppy supply chain so consumers can personally evaluate breeders and brokers, not to financially prop up Maryland breeders or suppress out-of-state competition.

In sum, the Puppy-Mill Act does not distinguish between in-state and out-of-state breeders or brokers. Nor does it inhibit out-of-state breeders and brokers from doing business in the State. Because plaintiffs have not plausibly alleged that the Act discriminates in its effect or purpose against out-of-state breeders and brokers, I shall deny leave to amend Count I.

### 2.   Discrimination Against In-State Retail Pet Stores

Plaintiffs allege in Count II that the Act discriminates against Maryland pet stores "who

---

[4] The Court recognizes that Delegate Kramer merely assumes that so called local "hobby breeders" care more about their dogs than commercial breeders. However, it is not the Court's function to assess the foundation of such beliefs.

are allowed to showcase dogs and cats for sale from any source but are prohibited from the actual sale or transfer." ECF 53-4, ¶ 132. Further, plaintiffs repeatedly claim that the Act is "illogical and does not serve to advance any legitimate local State interest" because the Act does not require breeders, brokers, or pet stores to certify the pet's health or provide consumers with other pertinent information at the time of sale. *Id.*; *see also id.* ¶¶ 136, 137.

Plaintiffs' proposed Count II can be disposed of readily. The allegations largely concern the Act's rationality. *See* ECF 54-3, ¶ 132 (claiming that banning pet stores from selling cats and dogs "is illogical and does not serve to advance any legitimate local State interest whatsoever"); *id.* ¶ 137. But, such a claim "relates to the wisdom of the statute, not to its burden on commerce." *Exxon*, 437 U.S. at 128. The remaining allegations appear to advance the theory that the Puppy-Mill Act violates the dormant Commerce Clause because it burdens in-state retail pet stores while benefiting out-of-state breeders and brokers as well as in-state animal shelters and unregulated "local breeders." *See* ECF 53-4, ¶¶ 133, 134, 136. These arguments, too, are without merit.

To the extent that the Act burdens in-state actors, these harms do not implicate the dormant Commerce Clause, which is concerned with preventing states from boosting in-state business, not impeding it. *See, e.g.*, *Dep't of Revenue v. Davis*, 553 U.S. 328, 337 (2008) ("The dormant Commerce Clause is driven by concern about 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'") (citation omitted). And, to the extent that the Act provides a boon to some in-state actors at the expense of others, the Constitution freely permits such intra-state economic favoritism. *See, e.g.*, *Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 109 (2003) (upholding state tax scheme favoring riverboat gambling over racetrack gambling); *Nordlinger v. Hahn*, 505 U.S. 1, 12 (1992) (upholding state property tax scheme favoring long term owners over new owners); *Williamson v.*

*Lee Optical of Oklahoma Inc.*, 348 U.S. 483, 75 (1955) (upholding regulation permitting only licensed optometrists or ophthalmologists to fit lenses for eyeglasses).

Therefore, I shall deny leave to amend Count II.

### 3.  *Pike* Balancing

Plaintiffs seek to revive their claim that, under the balancing test set forth in *Pike*, 397 U.S. 137, the Puppy-Mill Act, unconstitutionally burdens interstate commerce.  *See* ECF 53-4, ¶¶ 141-62.  They allege that the Act will put retail pet stores out of business.  And, they assert that the Act disadvantages USDA licensed out-of-state breeders and brokers, because they are precluded from showcasing and lack other cost-effective methods to reach Maryland consumers.  *Id.* ¶¶ 145-56.  On the other side of the ledger, plaintiffs claim that the Act serves no legitimate State interest because there were "no studies, reports, surveys, audits, or any other factual evidence to support a connection between Maryland's retail pet stores and the unlicensed and uninspected 'puppy mills,' or breeders who are breeding in substandard conditions."  *Id.* ¶ 157; *see id.* (averring that pet store plaintiffs "never obtained puppies from "substandard puppy mills").

These allegations do not plausibly allege that the Act's arguable burdens on interstate commerce are clearly excessive to the local benefits.  The Ninth Circuit's analysis in *National Association of Optometrists & Opticians v. Harris*, 682 F.3d 1144 (9th Cir. 2012), provides helpful guidance, although the procedural posture of this case differs.  In *Harris*, a group of opticians lodged a challenge under the dormant Commerce Clause to California statutes prohibiting licensed opticians, but not optometrists or ophthalmologists, from offering prescription eyewear at the same location in which eye examinations were conducted.  *Id.* at 1145.  As is relevant here, the district court denied the plaintiffs summary judgment on their *Pike* claim, and they appealed.  *Id.* at 1146.

The Ninth Circuit affirmed.  *Id.* at 1157.  The court rejected the plaintiffs' contention that

the challenged laws imposed a significant burden on interstate commerce on the ground that precluding opticians from utilizing one-stop shopping would result in a transfer of market share and income from out-of-state eyewear sellers, such as LensCrafters, Inc., to in-state optometrists and ophthalmologists. *See id.* at 1149, 1153. Relying on the Supreme Court's decision in *Exxon*, 437 U.S. 117, the court explained that California's laws did not burden interstate commerce because they simply regulated a "method of operating in a retail market," and the "dormant Commerce Clause does not protect this method of operation, nor guarantee Plaintiffs their preferred method of operation, in the eyewear retail market." *Id.* at 1151.

Similarly, the court dismissed the plaintiffs' argument that a *Pike* claim could rest on evidence that the challenged law swayed market share and profits to the detriment of out-of-state competitors. *Id.* According to the court, *Exxon* directs courts to focus on the "interstate *flow of goods*, not on where retailers were incorporated, what the out-of-state market shares of sales and profits were, or whether competition would be affected by the statute." *Id.* at 1153 (emphasis in original). Thus, the court concluded that "there is not a significant burden on interstate commerce" for the purposes of *Pike* balancing "merely because a non-discriminatory regulation precludes a preferred, more profitable method of operation in a retail market" or because "there is an incidental shift in sales and profits to in-state entities from retailers that operate in-state but are owned by companies incorporated out-of-state." *Id.* at 1154 (internal footnotes excluded).

"In light of this law," the court found it "apparent" that there was no dispute regarding whether the challenged laws place a significant burden on interstate commerce because the plaintiffs had "not produced evidence that the challenged laws interfere with the flow of eyewear into California." *Id.* at 1155. To the contrary, "any optician, optometrist, or ophthalmologist remains free to import eyewear originating anywhere into California and sell it there." *Id.*

By analogy, the Puppy-Mill Act does not restrict the flow of cats and dogs into Maryland. To be sure, it forbids breeders and brokers from reaching Maryland consumers through retail pet stores.   But, it leaves breeders and brokers with a host of other avenues to sell to Maryland consumers, including through the internet, via showcasing, and by transporting animals into the State.  *See* ECF 52 at 48.  Although these avenues may not be attractive or even feasible for some breeders and brokers, these are merely methods of operating, just like the one-stop shopping at issue in *Harris*.  As a result, plaintiffs' alleged burdens do not constitute burdens for the purposes of *Pike* balancing.

Moreover, the Proposed Amended Complaint does not plausibly allege that the burdens are clearly excessive to the Act's purported legitimate interests.  Plaintiffs aver that the Puppy-Mill Act advances no legitimate local interest because there are "no studies, reports, surveys, or any other factual evidence to support any connection between Maryland's retail pet stores and . . . puppy mills, or breeders who are breeding in substandard conditions."  ECF 53-4, ¶ 157.  Here, too, *Harris* is instructive.

In assessing the benefits of the challenged laws, the Ninth Circuit observed that *Pike* asks only "whether the burden on interstate commerce is 'clearly excessive in relation to the *putative* local benefits."  *Harris*, 682 F.3d at 1155 (emphasis in *Harris*) (quoting *Pike*, 397 U.S. at 142).  Further, the court reasoned that even if *Pike* demanded balancing actual, not merely putative, benefits, such an inquiry was unnecessary where there are no burdens weighing down one side of the scale.  *Id.*  "This is the implicit lesson of *Exxon*," the court reasoned, because after "the *Exxon* Court determined that there was no discrimination and no significant burden to interest commerce, it ended its dormant Commerce Clause analysis without assessing the value of the statute's purported benefits."  *Id.*  For the same reason, the court declined the plaintiffs' invitation to assess

whether the state's putative benefits were illusory, concluding that it would be "inappropriate for [the court] to determine the constitutionality of the challenged law based on [its] assessment of the benefits of those laws and the State's wisdom in adopting them." *Id.* at 1156.

Here, plaintiffs allege that the Act serves no legitimate interest, and they point to the paucity of empirical support for the belief that banning the sale of cats and dogs by Maryland pet stores will reduce the economic incentives of mill breeding. But, the Court need not test the State's putative benefits, which I have already explained are legion (ECF 52 at 71-72), where the Act does not impose significant burdens on interstate commerce. Accordingly, plaintiffs' contention that the State's benefits are lacking does not nudge their *Pike* claim across the plausibility threshold.

Accordingly, for the reasons stated above, I shall deny plaintiffs leave to amend Count III.

## B. Preemption

In Count IV, plaintiffs allege that the AWA, 7 U.S.C. § 2131 *et seq.*, preempts the Puppy-Mill Act. ECF 53-4, ¶¶ 163-69. According to plaintiffs, one of the AWA's purposes is to eliminate interstate burdens on commerce with respect to animals. *Id.* ¶¶164, 169. The Act frustrates this purpose, plaintiffs claim, because USDA licensed breeders and brokers located outside of Maryland are "effectively and practically banned" from doing business in the State because they cannot showcase and direct-to-consumer sales are cost prohibitive. *Id.* ¶ 168; *see id.* ¶ 166. Further, plaintiffs now also allege that the Act "interferes" with the ability of USDA licensed out-of-state breeders and brokers to "fulfill their USDA licensing requirements." *Id.* ¶ 167.

As an initial matter, plaintiffs misunderstand the purposes of the AWA. To be sure, the AWA references burdens on interstate commerce. But, 7 U.S.C. § 2131, which is titled "Congressional statement of policy," makes clear that Congress sought to "eliminate burdens upon [animal] commerce" as a means to an end. Specifically, Congress sought to regulate interstate

animal commerce "in order—(1) to insure that animals intended for use in research facilities or for exhibition purposes or for use as pets are provided humane care and treatment; (2) to assure the humane treatment of animals during transportation in commerce; and (3) to protect the owners of animals from the theft of their animals by preventing the sale or use of animals which have been stolen." *Id.* In short, the AWA's purpose is not to foster interstate commerce but to ensure the humane treatment of animals. *See Zimmerman v. Wolff*, 622 F. Supp. 2d 240, 248 (E.D. Pa. 2008).

In any event, plaintiffs' proposed allegations do not plausibly allege that the AWA implicitly preempts the Puppy-Mill Act, whether under the theory that the Act conflicts with the AWA's goals or renders compliance with the AWA impossible. *See Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985) (recognizing that conflict preemption occurs "'when compliance with both federal and state regulations is a physical impossibility,' or when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'") (internal citations omitted); *accord Johnson v. Am. Towers, LLC*, 781 F.3d 693, 707 (4th Cir. 2015); *Pinney v. Nokia, Inc.*, 402 F.3d 430, 457 (4th Cir. 2005).

To the extent that plaintiffs' preemption claim proceeds on the theory that the Puppy-Mill Act obstructs the AWA's licensing system, I already rejected that contention. *See* ECF 52 at 58-61. Obstacle preemption occurs  when a state law "'interferes with the *methods* by which the federal statute was designed to reach [its] goal.'" *Id.* at 55 (quoting *Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 829-30 (4th Cir. 2010)) (emphasis and brackets in *Columbia Ventures*) (citation omitted).  As previously explained, the Puppy-Mill Act erects no barriers to the AWA's licensing regime: the "Act's impact on pet stores does not clash with the AWA, because pet stores are explicitly exempt from the AWA" and "breeders and brokers who sell to Maryland consumers and who fall within the AWA's sweep 'will still have to get licenses,

will still have to provide information to federal officials, and will still have to open their facilities to federal inspection.'"  ECF 52 at 60 (quoting *N.Y. Pet Welfare Assocs., Inc. v. City of New York*, 850 F.3d 79, 88 (2d Cir. 2017)).

Perhaps in tacit recognition that the legal theory espoused in the original Complaint was not viable, plaintiffs now appear to allege that breeders and brokers cannot comply with  both the AWA and the Puppy-Mill Act.  A species of obstacle preemption, impossibility preemption exists "when it is 'impossible for a private party to comply with both state and federal requirements.'" *Merck Sharp & Dohme Corp. v. Albrecht*, ___ U.S. ___, 139 S. Ct. 1668, 1667 (2019) (quoting *Mut. Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 480 (2013)); *see also PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011); *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995).  This occurs whenever the regulated entity cannot satisfy its state obligations without obtaining "special permission and assistance" from the federal government. *Mensing*, 564 U.S. at 623.  Notably, "[i]mpossibility pre-emption is a demanding defense," and the movant must "demonstrate that it [is] impossible for it to comply with both federal and state requirements."  *Wyeth v. Levine*, 555 U.S. 555, 573 (2009).

Complying with both the AWA and the Puppy-Mill Act is not an impossibility.  The Act does not require breeders or broker to undertake any action that potentially conflicts with AWA regulations.  Indeed, the Act does not regulate breeders or brokers at all.  USDA licensed breeders and brokers who wish to avoid navigating the potential federal consequences associated with showcasing can simply steer clear of Maryland pet stores and utilize other methods to reach Maryland consumers.  Conversely, breeders and brokers intent on showcasing could decide to possess only four breeding females, in which case they would be exempt from the USDA's licensing regime.  *See* 9 C.F.R. § 2.1(a)(3)(iii).  Either way, it is readily apparent that plaintiffs

need not seek special dispensation from the federal government in order to adhere to the Puppy-Mill Act.

Further, the Proposed Amended Complaint does not undermine my finding that the AWA is entitled to a strong presumption against preemption because the treatment of animals is a matter historically reserved to the states.  ECF 52 at 56, 60-61; *see Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (observing that the presumption against preemption is especially strong "when Congress has legislated in a field traditionally occupied by the States").  Such a presumption is rebutted only where the federal statute evinces clear congressional intent to displace state or local measures.  *See* ECF 52 at 60-61.  Here, plaintiffs do not allege that Congress intended the AWA to preclude state or local regulation.  Nor could they; the AWA expressly invites such action.  *See* 7 U.S.C. §§ 2143(a)(8), 2145(b).  Therefore, plaintiffs have failed plausibly to allege that the AWA impliedly preempts the Puppy-Mill.  *See* ECF 52 at 60-61.

Thus, I shall decline plaintiffs' request to amend Count IV because do to so would be futile.

## C.  Equal Protection

In Count V, plaintiffs allege that the Act violates equal protection principles because it irrationally discriminates between "local Maryland hobby breeders" one the one hand, and USDA licensed breeders and brokers and retail pet stores, on the other.  ECF 53-4, ¶¶ 173, 174.  According to plaintiffs, the legislative history of the Puppy-Mill Act reveals that it is "based on numerous fallacies and a bare animus against retail pet stores that sell puppies and the out-of-state USDA licensed breeders that supply the animals."  *Id.* ¶ 176; *see id.* ¶ 183.  Further, plaintiffs reiterate that the Act advances no legitimate state interest because "no studies, reports, surveys, audits, or any other evidence has been shown whatsoever to support the purported interest in reducing 'puppy mills' through a ban."  *Id.* ¶ 179.  Moreover, plaintiffs "dispute the allegations stated by

the proponents of [the Act] and animal activists in the legislative record as unsubstantiated and/or false." *Id.* ¶ 182; *see id.* (attacking statements made during hearings before the House Economic Committee and Senate Finance Committee as "false and defamatory").

The proposed claim remedies the original Complaint's failure to identify with particularity those groups that are subject to differential treatment under the Act. *Compare* ECF 53-4, ¶¶ 172-73, *with* ECF 52 at 70 (finding that plaintiffs' "claim falters at the starting gate because they do not identify a similarly situated comparator group"). However, the proposed allegations still come up short: they do not trigger heightened scrutiny, nor do they negate the presumption of rationality afforded to economic legislation under ordinary rational basis review.

Plaintiffs seek to add new allegations to bolster their claim that the Puppy-Mill Act "was motivated by bare animus against USDA licensed breeders and brokers and Maryland retail pet stores — all of which were improperly labeled 'puppy mills' to garner political support." ECF 53-4, ¶ 172. To support this claim, plaintiffs rely heavily on the legislative record, particularly statements by Delegate Kramer, the Act's sponsor. *See id.* ¶¶ 50, 54-57. For instance, plaintiffs allege that Delegate Kramer said that "'100% of the sourcing of the retail pet stores is puppy mill industry puppies . . . .'" *Id.* ¶ 50 (quoting ECF 54-2 at 112, Tr. 5). And, they claim that Delegate Kramer referred to puppy mills as "part of a 'disgusting trade,' . . . 'absolute horror shows,' 'egregious abominations,' and 'barbaric horrific.'" *Id.* ¶ 54.

However, the Court cannot reasonably infer from these allegations that the Act was motivated by animus against breeders, brokers, and pet stores as a class. In opposing the State's Motion to Dismiss, plaintiffs submitted as exhibits the Act's legislative record. The Court took judicial notice of those materials. *See* ECF 52 at 25 (taking judicial notice of ECF 18-2, 18-3, and ECF 18-4). Indeed, in the Memorandum Opinion the Court highlighted many of Delegate

Kramer's statements.  *See* ECF 52 at 8, 9, 11-12.  But, as I previously explained, Delegate Kramer's ire was aimed at breeders that put profit before the health of the animals.  *Id.* at 69.  His statements reflect his view that pet stores are an appropriate regulatory target as a means to address objectionable breeders.  *See* ECF 53-4, ¶ 57 (Delegate Kramer: "Without the retail pet stores, selling the products of the abominations that are the puppy mills, then they will have no place to sell their pups.").

The Court also found that, "notwithstanding Delegate Kramer's strong language, numerous courts have recognized that addressing irresponsible animal breeding is a legitimate state interest." *Id.* (collecting cases).  Indeed, if passionate statements by legislators on matters of public concern constituted "animus," then legislation touching on hot-button social or economic issues that do not implicate a protected classification—for example, vaping, plastic bags, or the gig economy—would invariably receive heightened rational basis review.  Yet, that is not the law. *See, e.g.*, *Gallinger v. Becerra*, 898 F.3d 1012, 1021 (9th Cir. 2018) ("Accommodating one interest group is not equivalent to intentionally harming another."); *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 287 (2d Cir. 2015) ("Much of what states do is to favor certain groups over others on economic grounds. We call this politics."); *accord Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 653-54 (7th Cir. 2013) (refusing to apply heightened rational basis to public employee labor law); *Gallagher v. City of Clayton*, 699 F.3d 1013, 1018-19 (8th Cir. 2012) (rejecting invocation of heightened rational review to assess a state's ban on public smoking); *Olson v. California*, No. CV 19-10956-DMG (RAOx), 2020 WL 905572, at *9 (C.D. Cal. Feb. 10, 2020) (applying traditional, not heightened, rational basis scrutiny to a state law affecting gig-economy companies despite "some lawmakers' statements specifically complain[ing] about Uber"); *Wasatch Equality v. Alta Ski Lifts Co.*, 55 F. Supp. 3d 1351, 1367-69 (D. Utah 2014) (declining to

apply heightened rational basis to ski resort that permitted skiing but not snowboarding).

Moreover, the proposed allegations do not alter my conclusion that this case is dissimilar to the quartet of cases in which the Supreme Court applied a searching form of rational basis review. *See* ECF 52 at 66-69. Unlike those cases, the Puppy-Mill Act does not discriminate on the basis of an immutable trait or burden a historically oppressed group. *Compare United States v. Windsor*, 570 U.S. 744 (2013); *Romer v. Evans*, 517 U.S. 620 (1996); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973). The Act does not deprive a group of protections widely enjoyed by others, *see Romer*, 517 U.S. at 632, nor does it tread on our system of dual sovereignty. *See Windsor*, 570 U.S. at 768-72. And, the Puppy-Mill Act is not "inexplicable by anything but animus." *Romer*, 517 U.S. at 632.

At the end, plaintiffs' proposed allegations provide no basis to apply heightened rational basis scrutiny, and the Court again declines to do so. *See Wilkins v. Gaddy*, 734 F.3d 344, 348 (4th Cir. 2013) (rejecting application of "sliding-scale rational basis" to a prisoner's equal protection claim and noting that the "Supreme Court has only applied heightened scrutiny when it finds that a particular class . . . possesses immutable characteristics, faces historic or ongoing discrimination, or is subject to arbitrary burdens on some basis beyond its ability to control"); *Powers v. Harris*, 379 F.3d 1208, 1221 (10th Cir. 2004) (observing that the Supreme Court "has never applied *Cleburne*-style rational-basis review to economic issues").

Under the traditional rational basis framework, the Proposed Amended Complaint fails to state an equal protection claim because it does not "'negate every conceivable basis which might support the legislation.'" *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (citation omitted). First, plaintiffs allege that the Puppy-Mill Act serves no legitimate interest because there are "no studies, reports, surveys, audits or any evidence" to show that a ban on the retail sale of

dogs and cats curbs substandard breeding operations.  ECF 53-4, ¶ 179.  However, rational basis review imposes no affirmative evidentiary burden on the State; "rational speculation unsupported by evidence or empirical data" suffices.  *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993); *Pulte Home Corp. v. Montgomery Cty.*, 909 F.3d 685, 693 (4th Cir. 2018).  Thus, the alleged "absence of legislative facts explaining the distinction on the record has no significance in rational-basis analysis."  *Beach Commc'ns*, 508 U.S. at 315 (cleaned up and internal citations omitted).

Yet, the Act does not rest on rational speculation alone.  Rather, "the record contains ample facts that provide a rational basis for the Puppy-Mill Act," ECF 52 at 71:

> The General Assembly heard testimony that the USDA's regulations and Maryland's regulatory scheme were insufficient to ensure the humane treatment of dogs and cats. To illustrate, Delegate Kramer testified that USDA had roughly 100 inspectors for over 8,000 facilities. ECF 18-3 at 5. And, Ms. Jesse testified that, despite Maryland's reporting regulations, pet stores, including Just Puppies, continued to source dogs from "notorious" puppy mills. *Id.* at 10. In addition, the General Assembly heard testimony that pet store dogs sourced from puppy mills posed a public health risk, citing a recent study tracing an outbreak of drug-resistant bacteria to a pet-store puppy. *Id.* at 9. And, the General Assembly received evidence concerning the significant number of cats and dogs housed in Maryland animal shelters. *Id.* at 12.

Plaintiffs dispute the veracity of this evidence.  In their view, Delegate Kramer's testimony was "grossly exaggerated and inaccurate," ECF 53-4, ¶ 182(a), and the testimony concerning the health risks posed by pet store dogs is "false and defamatory."  *Id.* ¶ 182(c).  Similarly, plaintiffs claim that there is "no evidence . . . that the cats and dogs in shelters were the product of abandoned animals that were purchased from retail pet stores" or that "dogs at such shelters could meet the market demand of Maryland consumers for purebred and designer breed puppies."  *Id.* ¶ 183(e).

These attacks miss the mark.  It is well established that a legislative choice subject to rational basis review "is not subject to courtroom fact-finding."  *Beach Commc'ns*, 508 U.S. at 315.  That is because a court "may not sit as a superlegislature to judge the wisdom or desirability

of legislative policy determinations . . . ." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam).   Rather, "[w]here there are plausible reasons for [the legislature's] action, [the] inquiry is at an end."   *Beach Commc'ns*, 508 U.S. at 315.

The Court has already identified various purported legitimate interests advanced by the Puppy-Mill Act: "mak[ing] it more difficult for irresponsible breeding operations to evade scrutiny," "nudg[ing] consumers towards shelters," and "remov[ing] Maryland pet stores as a source of income for puppy-mills."   ECF 52 at 72.   The Court cannot second-guess the Maryland General Assembly.   *See Beach Commc'ns*, 508 U.S. at 313-14; *see also Powers*, 379 F.3d at 1218 (explaining that departing from rational basis review "would paralyze state governments" and substitute the court's "view of the public good or the general welfare for that chosen by the states"); Erwin Chemerinsky, *The Rational Basis Test Is Constitutional (and Desirable)*, 14 GEO. J.L. & PUB. POL'Y 401, 406-10 (2016) (extolling the virtues of rational basis review).   Therefore, the law passes constitutional muster.

The Supreme Court has instructed that "in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment."   *Dukes*, 427 U.S. 303-04.   Because plaintiffs cannot plausibly allege that the Puppy-Mill Act is wholly irrational, I shall deny leave to amend Count V.

### D.  Maryland Declaration of Rights

Count VI of the Proposed Amended Complaint, which is predicated on Article 41 of the Maryland Declaration of Rights, remains unchanged except for the inclusion of the following allegation, ECF 53-4, ¶ 190:

> The ban creates a monopoly for local Maryland hobby breeders, animal rescues and shelters to the exclusion of retail pet stores, which are banned from selling, and out-of-state USDA breeders and brokers, who are effectively banned since they have no ability to showcase their puppies in Maryland. The cost of transporting such

puppies to Maryland (if they chose to sell on the internet) is cost prohibitive to the average Maryland consumer.

The addition of this allegation does not resuscitate plaintiffs' State law claim. As already explained, "a monopoly for the purpose of Article 41 is an 'exclusive privilege,'" meaning "'an allowance or grant by the state to one or several of a sole right; that is, a right to the exclusion of all others than the grantee or grantees.'" ECF 52 at 77 (quoting *Levin*, 186 Md. at 182-83, 46 A.2d at 302; then *Wright v. State*, 88 Md. 436, 41 A. 795, 798 (1898)). Here, accepting all allegations in the Proposed Amended Complaint as true and drawing all reasonable inferences in plaintiffs' favor, the Puppy-Mill Act cannot fairly be viewed as an "exclusive privilege" because it does not confer a right to sell cats and dogs to one entity or even a particular class of market participants. To the contrary, and as plaintiffs' proposed allegation highlights, the Act in no way inhibits non-USDA licensed breeders, animal rescues, and shelters from selling to Maryland consumers. Nor does the Act, which concerns only pet stores, bar out-of-state breeders and brokers from doing business in Maryland. Thus, although the Act prohibits retail pet stores from selling cats and dogs, the pet market remains crowded with competitors. It follows that plaintiffs' proposed Count VI fails to state a viable claim under Article 41.

Further, I previously explained that an exclusive privilege is not "a monopoly in the constitutional sense when reasonably required for protection of some public interest . . .'" ECF 52 at 77 (citation omitted). And, I found that the "Act's legislative history demonstrates that Maryland's ban on the sale of cats and dogs in retail stores is intended to further the public's interest in preventing animal cruelty, increasing adoptions, and protecting consumers." ECF 52 at 78. Consequently, even were the Act characterized as creating a monopoly, it would not be one that implicates Article 41. Because no set of allegations can cure this defect, I shall deny leave to amend Count VI.

### IV.    Conclusion

To borrow a witticism attributed to the great Yogi Berra, the Proposed Amended Complaint feels "like déjà vu all over again."  *See* Victor Mather & Katie Rogers, *Behind the Yogi-isms: Those Said and Unsaid*, N.Y. TIMES (Sept. 23, 2015), https://nyti.ms/2YicB7x.  Plaintiffs' new allegations fail to cure the defects identified in my prior ruling.  Rather, plaintiffs repackage old arguments and cherry-pick from the legislative record, which the Court had already scrutinized. Allowing plaintiffs leave to amend would be an exercise in futility.  Therefore, I shall deny the Motion to Amend (ECF 53).

An Order follows, consistent with this Memorandum Opinion.

Date: May 6, 2020

                                            /s/
                                    Ellen Lipton Hollander
                                    United States District Judge